Shaun I. Blick, Esq.
Blick Law LLC
220 Davidson Avenue, Suite 300
Somerset, New Jersey 08873
(848) 222-3500 - Telephone
(848) 222-3550 - Fax
sblick@blicklaw.com
*Attorneys for Plaintiffs*
*James S. Goydos and Maria E. Martins*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
JAMES S. GOYDOS and MARIA E. MARTINS,  :
:   Civil Action No. 3:19-cv-8966
Plaintiffs,  :
:
vs.  :
:
RUTGERS, THE STATE UNIVERSITY a/k/a  :  **COMPLAINT AND DEMAND FOR**
RUTGERS, THE STATE UNIVERSITY OF NEW  :  **TRIAL BY JURY**
JERSEY a/k/a RUTGERS, RUTGERS CANCER  :
INSTITUTE OF NEW JERSEY (an independent  :
institute at Rutgers, The State University), RWJ  :
BARNABAS HEALTH, INC., STEVEN K.  :
LIBUTTI, individually and in his official capacity,  :
BRIAN L. STROM, individually and in his official  :
capacity, SAIBER LLC, WILLIAM F.  :
MADERER, individually and in his official  :
capacity, DANALYNN T. COLAO, individually  :
and in her official capacity, JOHN AND JANE  :
DOES 1-10 (names being fictitious and unknown),  :
and ABC CORPS. 1-10 (names being fictitious and  :
unknown),  :
:
Defendants.  :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs James S. Goydos and Maria E. Martins, by way of Complaint, by and through

their attorneys, Blick Law LLC, state upon information and belief:

## PRELIMINARY STATEMENT

1.      Plaintiff Dr. James S. Goydos, M.D. seeks relief pursuant to N.J.S.A. 34:19-1 *et seq.* (the Conscientious Employee Protection Act ("CEPA")) for the retaliatory and adverse employment conduct of Defendants Rutgers Cancer Institute of New Jersey, Rutgers, the State University of New Jersey, Dr. Steven K. Libutti, M.D., and Dr. Brian L. Strom, M.D., M.P.H. that has now culminated into, among other things, his constructive discharge and forced resignation from his position as Professor, Department of Surgery of Robert Wood Johnson Medical School, Rutgers, The State University of New Jersey, and Rutgers Cancer Institute of New Jersey.

2.      Separate and apart from the retaliatory and adverse employment conduct alleged, Dr. Goydos and his wife, Dr. Maria E. Martins, M.D, seek relief from all Defendants resulting from Dr. Goydos being falsely implicated in a crime and other statutory, common law, and civil rights violations associated therewith, and which are unrelated to the facts underlying the aforementioned CEPA claim.

## THE PARTIES

3.      Plaintiff James S. Goydos (hereinafter "Dr. Goydos") is an individual residing at 1 Fernwood Court, East Brunswick, New Jersey 08816.

4.      Plaintiff Maria E. Martins (hereinafter "Dr. Martins") is an individual residing at 1 Fernwood Court, East Brunswick, New Jersey.

5.      Defendant Rutgers, The State University a/k/a Rutgers, The State University of New Jersey (hereinafter "Rutgers") is a not-for-profit corporation registered in New Jersey with a principal places of business throughout the State of New Jersey including, but not limited to, campus locations at 57 US Highway 1, New Brunswick, New Jersey 08901-8554, as well as

2

other locations in: New Brunswick, New Jersey; Piscataway, New Jersey; Camden, New Jersey; and Newark, New Jersey.

6.      Defendant Rutgers Cancer Institute of New Jersey (hereinafter "RCINJ") is an independent institute at Rutgers with a principal place of business at 195 Little Albany Street, New Brunswick, New Jersey 08903-2681.

7.      Defendant RWJ Barnabas Health, Inc. (hereinafter "RWJ Barnabas") is a not-for-profit corporation registered in New Jersey with a principal place of business located at 95 Old Short Hills Road, West Orange, New Jersey 07052.

8.      Defendant Dr. Steven K. Libutti, M.D. (hereinafter "Libutti") is an individual residing at 89 Park Lane, West Harrison, New York 10604.

9.      Defendant Dr. Brian L. Strom, M.D., M.P.H. (hereinafter "Strom") is an individual residing at 20 Azalea Court, Middletown, New Jersey 07748.

10.     Defendant Saiber LLC (hereinafter "Saiber") is a for-profit limited liability company registered in New Jersey with a principal place of business at 18 Columbia Turnpike, Suite 200, Florham Park, New Jersey 07932.

11.     Defendant William F. Maderer (hereinafter "Maderer") is an individual residing at 617 Maple Court, Garwood, New Jersey 07027.

12.     Defendant DanaLynn T. Colao (hereinafter "Colao") is an individual residing at 2 Highland Avenue, Madison, New Jersey 07940.

13.     John and Jane Does 1-10 are fictitious persons whose identities are not yet known.

14.     ABC Corps. 1-10 are fictitious corporate entities whose identities are not yet known.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction of the matters complained of pursuant to 28 U.S.C. § 1331.

16.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims against certain Defendants arise under the Constitution of the United States of America and under 42 U.S.C. § 1983.

17.     This Court has supplemental jurisdiction over Plaintiffs' state statutory and common law claims pursuant to 28 U.S.C. § 1367, because the claims against Defendants are related to the claims upon which subject matter jurisdiction is based.

18.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, actions, or omissions giving rise to the dispute occurred in this District.

19.     The Court has personal jurisdiction over Rutgers because it maintains its principal place of business, transacts business, maintains substantial contacts, and/or committed the acts or omissions that are the bases of the claims set forth herein in New Jersey.

20.     The Court has personal jurisdiction over RCINJ because it maintains its principal place of business, transacts business, maintains substantial contacts, and/or committed the acts or omissions that are the bases of the claims set forth herein in New Jersey.

21.     The Court has personal jurisdiction over RWJ Barnabas because it maintains its principal place of business, transacts business, maintains substantial contacts, and/or committed the acts or omissions that are the bases of the claims set forth herein in New Jersey.

4

22.     The Court has personal jurisdiction over Libutti because he is employed, regularly transacts business, maintains substantial contacts, and/or committed the acts or omissions that are the bases of the claims set forth herein in New Jersey.

23.     The Court has personal jurisdiction over Strom because he resides in New Jersey, is employed, regularly transacts business, maintains substantial contacts, and/or committed the acts or omissions that are the bases of the claims set forth herein in New Jersey.

24.     The Court has personal jurisdiction over Saiber because it maintains its principal place of business, transacts business, maintains substantial contacts, and/or committed the acts or omissions that are the bases of the claims set forth herein in New Jersey.

25.     The Court has personal jurisdiction over Maderer because he resides in New Jersey, is employed, regularly transacts business, maintains substantial contacts, and/or committed the acts or omissions that are the bases of the claims set forth herein in New Jersey.

26.     The Court has personal jurisdiction over Colao because she resides in New Jersey, is employed, regularly transacts business, maintains substantial contacts, and/or committed the acts or omissions that are the bases of the claims set forth herein in New Jersey.

27.     The Court has personal jurisdiction over John and Jane Does 1-10, names being fictitious and whose identities are not yet known, because they reside in New Jersey, are employed, regularly transact business, maintain substantial contacts, and/or committed the acts or omissions that are the bases of the claims set forth herein in New Jersey.

28.     The Court has personal jurisdiction over ABC Corps. 1-10, names being fictitious and whose identities are not yet known, because they maintain their principal places of business, transact business, maintain substantial contacts, and/or committed the acts or omissions that are

the bases of the claims set forth herein in New Jersey. are fictitious corporate entities whose identities are not yet known.

## FACTS COMMON TO ALL COUNTS[1]

29.     This case involves Plaintiff Dr. James S. Goydos, M.D. ("Dr. Goydos"), an esteemed melanoma surgeon, cancer researcher, tenured medical school professor, mentor, husband, and father of three who was falsely implicated for the misdeeds of another.

30.     He has now been charged with serious crimes he has always maintained and continues to maintain he did not commit.

31.     Dr. Goydos is a selfless man who has made a life and career out of saving lives, yet he is now faced with the fight for his own and sudden personal and professional ruin.

32.     He has been forced out by the Rutgers Cancer Institute of New Jersey ("RCINJ") and Rutgers, the State University of New Jersey ("Rutgers") (collectively the "Institution"), the public establishments he called home for nearly 25 years.

33.     Upon information and belief, all of this was prompted by the very person who himself was suspected of perpetrating the same acts Dr. Goydos, an innocent man, is now being accused of committing.

### *The False Implication*

34.     Upon information and belief, Defendant Dr. Steven K. Libutti, M.D. ("Libutti"), a high-level state official and the current Director of RCINJ, used his position and power to secure the backing of a private corporate healthcare affiliate of the Institution, Defendant RWJ Barnabas Health, Inc. ("RWJ Barnabas"), of which he is also the Senior Vice President, Oncology

---

[1] All allegations and causes of action asserted are based upon information and reasonable belief as of the time of filing.

Services, to bankroll and partner in an investigation intended to clear his own name, while implicating someone else.

35.     Upon information and belief, that investigation was headed up by Defendant Saiber LLC ("Saiber"), a prominent law firm, and certain lawyers in that firm, Defendants William F. Maderer ("Maderer") and DanaLynn T. Colao ("Colao"), who conducted themselves as though they had been deputized under color of law.

36.     They assumed a quasi-prosecutorial role such that their conduct was of the type and nature characteristic of law enforcement.

37.     Among other things they retained retired FBI agents and sought to conduct investigatory interviews.

38.     Upon information and belief, they directed and/or participated in the search and seizure of computers, records, cell phones, and other evidence from both public and private sources.

39.     In so doing, and in conjunction with the efforts of Rutgers and RCINJ, they formed their own criminal investigative enterprise, without regard for due process or other protections to those they were investigating, which included Dr. Goydos - a public employee entitled to state and federally protected safeguards.

40.     At times, the impropriety of these actions and failure to adhere to Institution policies was readily acknowledged and has been documented by and through a statement given to law enforcement by a witness.

41.     That witness' statement also confirms that attempts were made to cure this misconduct by directing that the very evidence they had gathered be destroyed.

42.     This spoiled and unreliable investigation, fraught with due process and procedural violations, is believed to have been carried out by the joint efforts of Libutti, Rutgers, RCINJ, Saiber, Maderer, Colao, and RWJ Barnabas, and with the common purpose to exculpate one, Libutti, and falsely implicate another, Dr. Goydos.

43.     After gathering just enough innocent information that could be fashioned into a basis to incriminate an unwitting individual, upon information and belief, Rutgers, RCINJ, Libutti, Saiber, Maderer, and Colao served up to prosecutors and police on a silver platter otherwise innocuous information of a purely circumstantial nature about Dr. Goydos that was presented in such a way that compelled law enforcement to look to Dr. Goydos.

44.     The information gathered from the flawed investigation believed to have been controlled and directed by Libutti, his lawyers, RWJ Barnabas, and the Institution, and which was improperly and unlawfully obtained, was turned over to prosecutors and police who then secured search warrants supported by affidavits based on cherry-picked information gathered through their investigation efforts, much of which was, upon information and belief, either false, misleading, or out of context.

45.     In the early morning of March 30, 2018, Good Friday, just as they were planning to depart for an Easter weekend trip to visit their sons in Washington, D.C., investigators from the Middlesex County Prosecutor's office, in conjunction with other law enforcement agencies, descended upon the home of Dr. Goydos and his wife, Dr. Maria E. Martins, M.D. ("Dr. Martins") and their family, to execute a search warrant.

46.     As Dr. Goydos stood by and watched in disbelief and shock, investigators and police spent the entire day searching and rummaging through every inch of the house and its contents, and removing personal computers, data storage devices, cell phones, cameras, personal

effects, and anything else they could relate to the alleged crime(s) being investigated; the details of which, at that point, had still not yet been disclosed to Dr. Goydos.

47.     During the search investigators discovered a sealed bag containing a rifle, stored out of plain view and on a shelf in Dr. Goydos' basement work area.

48.     No ammunition was found anywhere on the premises.

49.     Dr. Goydos was placed under arrest, handcuffed, led shamefully into the street of his suburban neighborhood as friends and neighbors looked on, and transported to the local police station where he was booked and processed on a gun possession charge.

50.     If convicted that gun charge can result in a significant prison sentence.

51.     While being processed, in a flawlessly orchestrated and executed plan between the prosecutor's office and Libutti, Strom, Maderer, Colao, Saiber, Rutgers, and RCINJ, Rutgers police entered the local police station and served upon Dr. Goydos a letter from Defendant Dr. Brian L. Strom, M.D., M.P.H. ("Strom"), Chancellor of Rutgers Biomedical and Health Sciences and the Executive Vice President for Health Affairs at Rutgers University.

52.     That letter stated, among other things, that Dr. Goydos had been placed on administrative leave, was relieved of all responsibilities, and was to have no contact with any University students, patients, faculty, or staff.

53.     It also stated that Dr. Goydos was banned from all properties of Rutgers, the violation of which would result in charges for criminal trespass.

54.     There was no explanation in that correspondence or from Rutgers as to any charges being asserted or any indication of any allegations Dr. Goydos would be expected to meet.

55.     Instead, Rutgers officials and representatives, including, but not limited to Maderer, would only state that the subject matter underlying the administrative leave and inquiry were still under investigation and they were not at liberty to disclose any further detail.

56.     After being processed following his arrest, Dr. Goydos was transported to the Middlesex County Adult Correction Center where he was jailed overnight and released the following day.

57.     In the immediate aftermath following his placement on administrative leave, Dr. Goydos, by and through counsel, lodged an objection to the Institution's action describing it as, among other things, "abrupt and unexplained" and "with no apparent objective", as it had provided no detail as to the reason for the administrative leave determination.

58.     The Institution was placed on notice that its action, with no prospect or offering of a hearing, constituted a denial of due process as a public employee and a denial of Dr. Goydos' right to meet and respond to any purported charges.

59.     The Institution responded, in sum, by simply confirming his administrative leave status and reaffirming the terms of the ban based on the "University['s] understand[ing] that Dr. Goydos has appeared in court for the illegal possession of a firearm and that the Middlesex County Prosecutor's Office is continuing its investigation of other potential crimes that may have occurred at [R]CINJ in the fall of 2017."

60.     That response further confirmed that "Rutgers [was] conducting its own investigation into events occurring at RCINJ in the fall of 2017."

61.     Defendants' unlawful actions, under the guise of an official investigation, stripped a tenured medical school professor and acclaimed cancer surgeon and researcher of his

constitutionally protected rights, professional privileges and reputation, and left his patients and colleagues to speculate and churn the rumor mill as to what happened to Dr. Goydos.

62.     In addition to the obvious impact on Dr. Goydos, these acts committed by Defendants directly and detrimentally impacted the cancer research community, and, most importantly, those patients who were relying on Dr. Goydos' care and expertise to overcome their cancer diagnoses, and in many cases, for their survival.

63.     Despite his own sudden legal woes, Dr. Goydos was so concerned about the well-being of several patients with immediate treatment needs, some of whom were scheduled for operations the week of his arrest, he requested from the Institution that a list of his patients be turned over so that he could provide notes and treatment directives to the covering physician at RCINJ who would be assuming their care, and to reach out to those patients so that Dr. Goydos could discharge his ethical obligations as a physician and surgeon.

64.     With operations scheduled in the coming days, and patients depending upon his care, the Institution refused to accommodate the request and simply responded by reasserting its directive to remain compliant with its purported ban from its premises and from communicating with patients and staff members.

65.     On December 7, 2018, almost 9 months after being placed on administrative leave, with no charges being asserted against him, no criminal conviction, and with no hearing afforded by the Institution, counsel for Rutgers advised counsel for Dr. Goydos that it would be pursuing detenuring proceedings against him in the coming days.

66.     No basis for the contemplated detenuring was provided.

67.     To avoid further persecution by a process that, upon information and belief, would inevitably be fueled with misinformation and evidence secured by improper means, on December 14, 2018 Dr. Goydos was compelled to tender his resignation from the Institution.

68.     On December 28, 2018, relying in part on the evidence gathered in the course of the investigation commenced and directed by Defendants, and without the benefit of Dr. Goydos' account, Dr. Goydos was indicted by a Middlesex County Grand Jury on 160 counts for alleged violations stemming from a crime he did not commit - the placement of a camera in the second-floor women's bathroom at RCINJ.

69.     The alleged motive advanced was that in an effort to setup Libutti for reasons yet to be validated and which remain unknown, Dr. Goydos is alleged to have broken into RCINJ and certain rooms and offices therein and fished through the ceiling a complex network of wires connecting a camera in the bathroom to a termination point somewhere in Libutti's office.

70.     It has also been advanced that officials received a tip from an anonymous source claiming that Libutti was seen going into or coming out of the second-floor women's bathroom at RCINJ.

71.     Law enforcement and the Institution are taking the position that the tipster was Dr. Goydos, and that he allegedly submitted the tip for the purpose of setting up Libutti for some unknown reason.

72.     Dr. Goydos appears to have been implicated in this crime because, upon information and belief, in mid-to-late 2014, a janitor at RCINJ reported that Dr. Goydos was seen getting a cup of coffee from then RCINJ Director Dr. Robert S. DiPaola, M.D.'s ("Dr. DiPaola") suite after-hours.

73.     Dr. Goydos had been given permission to go into the suite to get coffee at his discretion.

74.     Following an inquiry into this report, a Rutgers investigator cleared Dr. Goydos of any wrongdoing and found the charges to be unsubstantiated.

75.     Upon information and belief, it is based on this incident and the unproven allegation that Dr. Goydos submitted a supposed anonymous tip implicating Libutti in going into the women's bathroom that Dr. Goydos has now been thrust into the cross-hairs of the investigation described herein and, as a result, has been put in a position in which he is fighting for his liberty, defending his good name and reputation, and has sustained significant damage to his career and suffered a major impediment in his capacity to earn a living.

76.     These occurrences have been taxing on Dr. Goydos and Dr. Martins and their family, and they have been forced to endure the pain and humiliation of these salacious and embarrassing charges, and the expense, burden, and risk of having to defend against 160 criminal counts, all while doing so without the paycheck that the Goydos family had been receiving for nearly 25 years.

77.     Moreover, given the nature of the criminal charges asserted, and in the interest of being compliant with the rules governing medical licensees, Dr. Goydos has self-reported to the state medical licensing board the law enforcement action being taken, despite the full knowledge that he now runs the risk of license suspension, revocation, or other disciplinary action.

78.     In the face of this nightmarish chain of events, all of which carry devastating repercussions, Dr. Goydos is emphatic and vigorous in defense of his innocence as to the alleged crimes from which this all stems.

*Retaliation and Adverse Employment Action*

79.     Separate and apart from the aforesaid acts, Dr. Goydos has been subjected to ongoing retaliation and adverse employment action.

80.     In or about early 2014, then RCINJ Director Dr. DiPaola hired Dr. Howard Kaufman, M.D. ("Dr. Kaufman") as the Associate Director of Clinical Research at RCINJ, a position responsible for overseeing clinical research.

81.     At or about that time, Dr. David August, M.D. ("Dr. August") was Chief of the Division of Surgical Oncology.

82.     In or about mid-2014, Dr. Kaufman assumed the role of Chief of the Division of Surgical Oncology and Dr. August was made the Section Chief of GI Surgical Oncology.

83.     As a result, Dr. Kaufman became Dr. Goydos' superior, and Dr. August, previously Dr. Goydos' supervisor, had become equal in rank to Dr. Goydos as a Section Chief.

84.     As a grant reviewer for the National Cancer Institute ("NCI"), Dr. Goydos had the privilege of making continuous grant applications throughout the year, even though others could only submit grants at specified times.

85.     In or about mid-2014, Dr. Goydos was preparing a research project modular grant (R01), which is a grant that is funded on a budget model of $250,000.00 annual increments for a period of five years.

86.     Part of the grant application process includes the preparation of a budget, which in large part contains salary support details for the faculty and staff to be involved in the proposed research efforts.

87.     This grant, if awarded, would be in addition to R01, K24, and R21 grants previously secured, and which, according to Dr. Goydos' records, were already funding approximately 60% of Dr. Goydos' base salary support.

88.     This new grant would fund an additional 20% of Dr. Goydos' base salary support.

89.     Accordingly, between the existing grants and the new application, if approved, Dr. Goydos' salary support would be approximately 80% funded by his research efforts.

90.     In addition to those research efforts, Dr. Goydos was assigned 20% full time equivalent effort for his clinical work, which includes performing surgical procedures, caring for patients, etc.

91.     Therefore, the 80% salary support derived from research funding and the 20% derived from clinical work together would account for approximately 100% of Dr. Goydos' efforts.

92.     After Dr. Goydos completed the preparation of the budget for the new R01 grant application, it was submitted to the Institution's finance department to be reviewed.

93.     Finance was responsible for reviewing grant application budgets and would contact the person submitting the budget if there were any errors, inconsistencies, changes, etc.

94.     Dr. Goydos received a call from an individual in the finance department advising him that following a review of the budget submitted for the new R01 grant, it was determined that the 20% effort he allotted to salary support would result in his total effort (research and clinical) exceeding 100%.

95.     Dr. Goydos informed him that this was impossible as he had maintained meticulous records.

96.     The individual further advised that according to finance's records, Dr. Goydos was assigned an approximate 50-60% full time equivalent status for his clinical work that, if true, together with the additional 20% from the new grant, would exceed 100%.

97.     In accordance with NIH rules, the total effort, both clinical and research, cannot exceed 100%.

98.     The man faxed the numbers to Dr. Goydos for review.

99.     After reviewing the numbers, Dr. Goydos discussed this with Dr. Kaufman and he presented to Dr. Kaufman the fax he received from the finance department.

100.    Dr. Kaufman retrieved the numbers on his computer, and he confirmed that Dr. Goydos' accounting was accurate at approximately 20% clinical, as opposed to the 50-60% appearing in the finance department's system.[2]

101.    At that point, Dr. Goydos advised Dr. Kaufman that if he were to submit the grant to the NCI it would constitute a fraud based on incorrect numbers.

102.    Dr. Kaufman agreed and said that he would look into the discrepancy.

103.    Sometime that week, upon information and belief, Dr. Kaufman brought the discrepancy to the attention of the RCINJ leadership including Dr. DiPaolo, Kevin Coyle, the Chief Financial Officer at RCINJ, and Linda Tanzer, Chief Administrative and Operating Officer and Associate Director for Administration and Planning at RCINJ, among others.

104.    After a meeting attended by RCINJ leadership, Dr. Goydos heard from one of the meeting attendees that Dr. Kaufman reported that Dr. Goydos was accusing the Institution of

---

[2] Prosecutors and the Institution removed all records of grants, applications, and the referenced fax during the investigation and search of Dr. Goydos' home. The Institution and the State remain in possession of those materials.

fraud, when in fact, he was trying to confirm the correct numbers in order to avoid perpetrating a fraud himself.

105.    Dr. Goydos was growing concerned and pressed the issue because he knew that a discrepancy in the full time equivalence percent based on incorrect data, would constitute a fraud as to any applications already submitted and to be submitted to the NCI and to the Institution's partner, Robert Wood Johnson University Hospital, which pays out bonuses to faculty based on these figures.

106.    After previously reporting this issue to Dr. Kaufman several times, Dr. Goydos reported the issue to an investigator at the Institution.

107.    Nothing was done to address these reports.

108.    In or about February 2017, after Libutti replaced Dr. DiPaola as Director of RCINJ, Libutti and Dr. Goydos had a meeting at which point Libutti encouraged Dr. Goydos to speak freely about his concerns.

109.    At that meeting, Dr. Goydos reiterated his concerns over the discrepancy in the numbers being maintained by the Institution.

110.    He also reiterated his worry that a grant application submission based upon incorrect numbers could give rise to a fraud upon the NCI and Robert Wood Johnson University Hospital.

111.    After that meeting with Libutti, Dr. August informed Dr. Goydos that Libutti described him as a negative force at RCINJ.

112.    At or about that same time, preparations were being made for RCINJ's submission of application materials for renewal of RCINJ's Cancer Center Support Grant through the NCI, which was due the following January.

17

113.    Dr. Goydos had been advocating heavily for placing patients into research trials.

114.    Researchers regularly apply for seed money to perform preliminary work in order to apply for major grants.

115.    Seed money funding was rarely granted.

116.    Since this period was the "year of record" for RCINJ's Cancer Center Support Grant application, and it would have reflected poorly on RCINJ if there were no seed money grants, upon information and belief, Libutti directed that researchers execute documents stating that they had received seed money, when in fact, they did not actually receive those funds.

117.    As the survival of RCINJ's research efforts, operating budget, ranking, and bottom line is based, in large part, on NIH and NCI grant funding, RCINJ's leadership swept Dr. Goydos' reports under the rug and chose to ignore and silence Dr. Goydos.

118.    The prospect of bringing to light what had been reported by Dr. Goydos would be devastating to RCINJ and a public relations nightmare for the Institution under Libutti's leadership, whose appointment was the product of the joint efforts of both Rutgers and RWJ Barnabas.

119.    RCINJ was already fighting with other cancer care providers in the region for limited market share and such a scandal would threaten patient referrals and coveted grant money that was already difficult to secure, as well as likely expose the Institution to possible state and federal investigation.

120.    Indeed, RCINJ had already been looking to make up for its decline in market share and research trial accrual by affiliating with RWJ Barnabas, which was publicly touted as an effort that would "create the premier academic health care system in the state" and "to develop centers of excellence; invest in clinical, academic and research innovations; educate

health professionals; and improve health through coordinated patient outreach, prevention and treatment of disease."

121.    In reality, upon information and belief, research efforts at RCINJ had begun to slump and career researchers and staffers had begun an exodus from the Institution that continues to this day.

122.    Dr. Goydos was not only vocal about what he reasonably believed to be the fraud and misappropriation he discovered and ultimately reported, but he was also vocal about his concern that RCINJ was departing from its research roots and turning to a more profitable clinical business model, as evidenced by the affiliation with RWJ Barnabas, a private healthcare entity.

123.    As retribution for being too vocal, Dr. Goydos was labeled by the Institution and certain administrators as a troublemaker, as someone who knew more than he should, and false rumors began to circulate that Dr. Goydos had been criticizing RCINJ, the very institution that he helped found almost 25 years earlier.

124.    As detailed above, the Institution launched an internal investigation targeting Dr. Goydos after it was allegedly reported by a janitorial staff member that he was observed going into the director's suite to get a cup of coffee one evening while working late.

125.    That investigation was fully vetted by Rutgers and the allegation proven to be unsubstantiated.

126.    It was also later alleged that a memorandum had been placed into Dr. Goydos' employment file stating falsely that he had been disparaging RCINJ.

127.    In another instance of retaliation, RCINJ increased Dr. Goydos' full time equivalent status from 20% to 40% without explanation.

128.    That resulted in the decrease of the bonus money paid to Dr. Goydos each year.

129.    These occurrences make clear that after reporting what he reasonably believed to be fraud and misappropriation, and because he had been so vocal about the divergence from research efforts to clinical efforts, punishment was being perpetrated upon Dr. Goydos.

130.    It is also clear that the timing of the criminal gun charge against Dr. Goydos made it the perfect opportunity for the Institution to capitalize on his unfortunate circumstances and take measures to effectively terminate his employment by constructive discharge, despite the fact that he had never been charged with anything, and as a public employee, was never given a hearing or other due process to meet any charges by the Institution.

131.    Plaintiffs, by and through this action, in addition to defending in the criminal case, now seek complete vindication, reparation, and damages from those who have negligently, recklessly, improperly, vindictively, and falsely placed Dr. Goydos and his family in this perilous position due to the alleged misconduct, violations of legal obligations, self-interest, and otherwise unlawful acts of the Defendants.

## NEW JERSEY TORT CLAIMS ACT COMPLIANCE

132.    Rutgers and RCINJ are public entities as defined by N.J.S.A. 59:1-3.

133.    On June 21, 2018, Dr. Goydos, by and through counsel, submitted a timely notice of tort claim to Rutgers and RCINJ pursuant to N.J.S.A. 59:8-4 detailing the offending acts aforesaid.

134.    On July 20, 2018, Rutgers and RCINJ acknowledged receipt of the notice of tort claim and forwarded to Dr. Goydos an adopted form of notice of tort claim.

135.    On July 31, 2018, Dr. Goydos, by and through counsel, submitted a timely supplement to the initial notice of tort claim, in compliance with the form adopted by Rutgers and RCINJ.

136.    On July 31, 2018, Rutgers and RCINJ acknowledged receipt of the supplement in the form adopted by Rutgers and RCINJ.

## FIRST COUNT
*(Violation of 42 U.S.C. § 1983 et seq. (Civil Rights Violation Claim as Against All Defendants)*

137.    Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

138.    Pursuant to N.J.S.A. 18A:65-1 *et seq.*, N.J.S.A. 59:1-1 *et seq.*, and applicable case law, Rutgers is a public entity and state actor.

139.    Pursuant to N.J.S.A. 18A:65-94(a), RCINJ is an "independent institute at Rutgers, The State University . . ." and is a public entity and state actor.

140.    By virtue of his position as Director of RCINJ, Libutti is a public employee and state actor.

141.    By virtue of his position as Chancellor of Rutgers Biomedical and Health Sciences and the Executive Vice President for Health Affairs at Rutgers, Strom is a public employee and state actor.

142.    RWJ Barnabas, Saiber, Maderer, Colao, John Does 1-10, and ABC Corps. 1-10 have engaged, aided, abetted, conspired, funded, and otherwise masterminded the aforementioned conduct complained of with, and complicit with, Rutgers, RCINJ, Libutti, Strom, John Does 1-10, and ABC Corps. 1-10 such that:

    a.   there is a sufficiently close nexus between Rutgers, RCINJ, Libutti, Strom, John Does 1-10, and ABC Corps. 1-10 and the alleged conduct of RWJ Barnabas, Saiber, Maderer, Colao, John Does 1-10, and ABC Corps. 1-10 so that the action of the latter may fairly be treated as that of Rutgers, RCINJ, Libutti, Strom, John Does 1-10, and ABC Corps. 1-10 themselves;

    b.   Rutgers, RCINJ, Libutti, Strom, John Does 1-10, and ABC Corps. 1-10 have so far insinuated themselves into a position of interdependence with RWJ Barnabas, Saiber, Maderer, Calao, John Does 1-10, and ABC Corps. 1-10 that they must be recognized as joint participants in the activities complained of;

    c.   RWJ Barnabas, Saiber, Maderer, Colao, John Does 1-10, and ABC Corps. 1-10 were willful participants in joint action with Rutgers, RCINJ, Libutti, Strom, John Does 1-10, and ABC Corps. 1-10; and

    d.   RWJ Barnabas, Saiber, Maderer, Colao, John Does 1-10, and ABC Corps. 1-10 have been delegated powers traditionally exclusively reserved to the state.

143.    At all times relevant hereto, Dr. Goydos was employed by Rutgers and RCINJ and was a tenured medical school professor.

144.    As such, Dr. Goydos was at all relevant times hereto, a public employee and a tenured professor in a public institution, and pursuant to New Jersey statute, case law, and the policies and regulations promulgated by Rutgers and RCINJ, had a protected property right and interest in his employment.

145.    Dr. Goydos was, at all times relevant hereto, entitled to certain federal, state, and policy and regulatory safeguards and protections.

146.    Separate and apart from the aforesaid retaliation and adverse employment action taken against Dr. Goydos, Rutgers, RCINJ, RWJ Barnabas, Libutti, Strom, Saiber, Maderer, Colao, John Does 1-10, and ABC Corps. 1-10, while acting under color of law and exploiting their positions of power and authority, intentionally conspired to violate and deprive Dr. Goydos of his rights, safeguards, and protections afforded by the United States Constitution, the New Jersey State Constitution, New Jersey statute, and Institution policy and regulation including, but not limited to those rights afforded by: the Fourth; the Fifth; the Sixth; and the Fourteenth Amendments of the United States Constitution.

147.    Specifically, and in addition to the other conduct detailed herein, at all times relevant hereto:

    a.  Dr. Goydos was confronted by Defendants with inquiries in furtherance of what turned out to be a quasi-criminal investigation designed and led by them, without Defendants advising Dr. Goydos of his rights, or disclosing to him the subject matter of the investigation and the potential criminal and civil exposures that would likely result therefrom.

    b.  On at least two separate occasions, Defendants demanded that Dr. Goydos present himself for a deposition-like "interview", with court reporter present, without disclosing to him the subject matter of the questioning and threatening that his failure to cooperate could result in criminal charges and formal adverse employment action, including, but not limited to discipline.

    c.  After advising Defendants that Dr. Goydos had retained counsel, they continued to demand his cooperation despite acknowledging the potential for criminal charges.

d.  After waiting for Dr. Goydos to leave his office, and without Dr. Goydos'
knowledge, Defendants conducted a warrantless and unauthorized search and
seizure of his office computer, which contained private content and property, and
HIPAA (Health Insurance Portability and Accountability Act of 1996) protected
information about his patients.

e.  After acknowledging the impropriety and unlawful nature of their secretive search
and seizure operation, Defendants then attempted a "do-over" by directly
confronting Dr. Goydos and demanding from him access to his office computer
and cell phone, in which he had a reasonable expectation of privacy, which were
seized and searched by Defendants without Dr. Goydos' permission.

f.  Defendants cherry-picked otherwise innocent, out-of-context information
gathered from their unlawful and warrantless investigation and search and seizure
efforts and delivered that information to law enforcement in a manner intended or
otherwise designed by Defendants to support the issuance of a search warrant of
Dr. Goydos and Dr. Martins' home in an effort to clear Libutti from suspicion of
criminal conduct, while falsely implicating Dr. Goydos.

g.  Defendants made affirmative false statements and materially omitted certain
exonerating information about Dr. Goydos to third-parties that has harmed his
personal and professional reputation and burdened or altered his status and rights
including, but not limited to, statements and omissions to third-parties such as the
hospital at which he held professional privileges, prospective employers, the
press, law enforcement, the State Board of Medical Examiners, and Defendants'
employees.

24

h.  Without being charged with any violation of policy, regulation, or law, the Institution placed Dr. Goydos on administrative leave from his employment without any opportunity to meet, answer to, or otherwise provide any response in defense of the actions being taken against him.

i.  For almost 9 months (between March 30, 2018 and December 14, 2018), when Dr. Goydos was constructively discharged from his employment, and after he was forced to tender his resignation, Defendants never lodged any charges against him, never provided him with a hearing, and never afforded him any opportunity to respond, answer, or otherwise defend against anything.

j.  During that near 9 month period of administrative leave, Defendants unlawfully banned Dr. Goydos from Rutgers and RCINJ property, directed that Dr. Goydos have no contact with his colleagues, fellow employees, and patients, and deprived him of the right to retrieve, enjoy, and benefit from his personal belongings located at his workplace, all under threat of criminal prosecution if he were to violate any of Defendants' ban terms.

k.  Without being charged with any violation of policy, regulation, or law, Defendants informed Dr. Goydos that they would be commencing detenuring proceedings.

l.  To avoid further persecution by the aforementioned circumstances and a process that would inevitably be fueled with misinformation and evidence secured by improper means, on December 14, 2018 Dr. Goydos was compelled to tender his resignation from Rutgers and RCINJ.

25

m.  As a direct result of Defendants' conduct and resulting ban and placement of Dr. Goydos on administrative leave, rumors of what happened to Dr. Goydos spread throughout the local and professional community, he was stigmatized because he did not have the opportunity or forum to explain to people what was happening to him, he was involuntarily removed from his medical practice, teaching responsibilities, and research projects, he became an unemployable "hot potato" with potential employers, and he was charged with crimes stemming from alleged conduct of which he is innocent.

n.  Dr. Goydos is now faced with a criminal prosecution alleging very serious crimes, mounting criminal defense costs, the risk of being falsely convicted, unemployment and unemployability, his personal and professional reputation being obliterated, the risk of his medical license being suspended, years of education and experience being voided, the dream and reality of helping cancer patients to survive being crushed, and strife at home resulting from what has become Dr. Goydos and his family's new reality.

148.  As a result of the aforementioned violations and deprivations of Plaintiffs' rights, safeguards, and protections afforded by law, Plaintiffs have and will continue to suffer severe and permanent damages.

## SECOND COUNT
***(Violation of N.J.S.A. 34:19-1 et seq. (Conscientious Employee Protection Act ("CEPA")) as Against Rutgers, RCINJ, Libutti, Strom, John Does 1-10, and ABC Corps. 1-10)***

149.  Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

150.    Rutgers, RCINJ, Libutti, Strom, John Does 1-10, and ABC Corps. 1-10 are employers as defined by N.J.S.A. 34:19-2(a).

151.    Dr. Goydos is an employee as defined by N.J.S.A. 34:19-2(b).

152.    At all times relevant hereto, Dr. Goydos was employed by Rutgers, RCINJ, Libutti, Strom, John Does 1-10, and ABC Corps. 1-10 either directly or implicitly, by virtue of their control, direction, and management of his work.

153.    During the course of his employment, Dr. Goydos disclosed, or threatened to disclose to a supervisor or to a public body an activity, policy or practice of his employer(s), or another employer, with whom there is a business relationship, that he reasonably believed: was in violation of a law, or a rule or regulation promulgated pursuant to law; or was fraudulent or criminal.

154.    During the course of his employment, Dr. Goydos provided information to public bodies conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship.

155.    During the course of his employment, Dr. Goydos objected to, or refused to participate in any activity, policy or practice which he reasonably believed: was in violation of a law, or a rule or regulation promulgated pursuant to law; was fraudulent or criminal; or is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

156.    At all relevant times hereto, the offending conduct complained of by Dr. Goydos was, upon information and belief, known to one or more of his supervisors and his employer(s).

157.    As a consequence of Dr. Goydos' aforesaid disclosure or threatened disclosure, information provided, and/or objection or refusal to participate in the offending conduct, Rutgers, RCINJ, Libutti, Strom, John Does 1-10, and ABC Corps. 1-10 engaged in retaliatory and adverse employment actions directed at Dr. Goydos.

158.    As a direct and proximate result of these retaliatory and adverse employment actions, Dr. Goydos has been damaged, continues to be damaged, and will be damaged in the foreseeable future.

### THIRD COUNT
*(Defamation as Against All Defendants)*

159.    Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

160.    Separate and apart from the aforesaid retaliation and adverse employment action taken against Dr. Goydos, Rutgers, RCINJ, Libutti, Strom, Saiber, Maderer, Colao, RWJ Barnabas, John Does 1-10, and ABC Corps. 1-10 have asserted false and defamatory written and oral statements about Dr. Goydos.

161.    Those false and defamatory statements were published by the Defendants to third-parties and were unprivileged.

162.    Defendant's publication of those false and defamatory statements was negligent, careless, reckless, or wanton and willful.

163.    As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged, continue to be damaged, and will be damaged in the foreseeable future.

28

## FOURTH COUNT
### *(False Light - Invasion of Privacy as Against All Defendants)*

164.   Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

165.   Separate and apart from the aforesaid retaliation and adverse employment action taken against Dr. Goydos, Defendants directly, or by and through their spokesperson(s), have issued false statements about Dr. Goydos to third-parties including but not limited to the press.

166.   The false light in which Dr. Goydos was placed is highly offensive to a reasonable person.

167.   Defendants had knowledge of, or otherwise acted in reckless disregard as to the falsity of the publicized matters and the false light in which Dr. Goydos would be placed.

168.   Defendants further had knowledge of, or otherwise acted in reckless disregard as to the falsity of the publicized matters and the false light in which Dr. Goydos would be placed, and which would have a direct and detrimental impact on Dr. Martins.

169.   As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged, continue to be damaged, and will be damaged in the foreseeable future.

## FIFTH COUNT
### *(Tortious Interference with Business Relations as Against All Defendants)*

170.   Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

171.   Plaintiffs have a protected interest in Dr. Goydos' employment and employability, reputation and good name, tenured status, hospital privileges, ability to practice medicine, ability to perform research, relationship with past, present, and future patients, relationship with others in the medical and research communities, and medical licensure.

29

172.     Separate and apart from the aforesaid retaliation and adverse employment action taken against Dr. Goydos, Rutgers, RCINJ, RWJ Barnabas, Libutti, Strom, Saiber, Maderer, Colao, John Does 1-10, and ABC Corps. 1-10 intentionally interfered in Plaintiffs' protected interests by engaging in the conduct set forth herein.

173.     In addition, Dr. Goydos has been denied employment opportunities with third-parties due to the intentional interference by the Defendants.

174.     That interference was reasonably likely to cause the loss of prospective gain from those protected interests.

175.     As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged, continue to be damaged, and will be damaged in the foreseeable future.

## **SIXTH COUNT**
### *(Intentional Infliction of Emotional Distress as Against All Defendants)*

176.     Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

177.     Separate and apart from the aforesaid retaliation and adverse employment action taken against Dr. Goydos, Rutgers, RCINJ, Libutti, Strom, Saiber, Maderer, Colao, RWJ Barnabas, John Does 1-10, and ABC Corps. 1-10 acted intentionally and in a manner that was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is to be regarded as atrocious, and utterly intolerable in a civilized community.

178.     Defendants' actions aforesaid proximately caused and will continue to cause emotional distress that is so severe that no reasonable person could be expected to endure it.

179.     As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged, continue to be damaged, and will be damaged in the foreseeable future.

## SEVENTH COUNT
### (Negligence as Against All Defendants)

180.    Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

181.    Separate and apart from the aforesaid retaliation and adverse employment action taken against Dr. Goydos, Rutgers, RCINJ, RWJ Barnabas, Libutti, Strom, Saiber, Maderer, Colao, John Does 1-10, and ABC Corps. 1-10 owed a duty to Plaintiffs to act with reasonable prudence and care so as to avoid causing them harm or engaging in the conduct alleged herein.

182.    Defendants breached that duty by wantonly, willfully, carelessly, negligently, and/or recklessly engaging in the acts and omissions aforesaid.

183.    As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged, continue to be damaged, and will be damaged in the foreseeable future.

## EIGHTH COUNT
### (Conversion as Against Rutgers, RCINJ, John Does 1-10, and ABC Corps. 1-10)

184.    Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

185.    Prior to his being placed on administrative leave, Dr. Goydos maintained an office and laboratory at Rutgers and RCINJ that contained his personal belongings.

186.    At all times relevant hereto, Dr. Goydos owned that personal property and had, and continues to have the right to immediate possession and use of that personal property.

187.    Separate and apart from the aforesaid retaliation and adverse employment action taken against Dr. Goydos, Rutgers, RCINJ, John Does 1-10, and ABC Corps. 1-10 have wrongfully and without justification interfered with that right and have refused Dr. Goydos access to and possession of his personal belongings.

188.    As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged, continue to be damaged, and will be damaged in the foreseeable future.

## NINTH COUNT
### *(Breach of Contract as Against Rutgers and RCINJ)*

189.    Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

190.    Dr. Goydos had a contract of employment with Rutgers and RCINJ by virtue of his tenured status, applicable law, and policies adopted by Rutgers.

191.    According to Rutgers Policy Section 60.5.13, a tenured employee "shall hold the office indefinitely at the pleasure of the Board of Governors."

192.    Despite Dr. Goydos' faithful and complete performance of his duties, Rutgers and RCINJ breached his employment contract by declaring that it would pursue detenuring proceedings, without the ratification or direction of the Board of Governors, thereby breaching its own employment policy.

193.    That breach proximately resulted in Dr. Goydos' constructive discharge.

194.    As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged, continue to be damaged, and will be damaged in the foreseeable future.

## TENTH COUNT
### *(Per Quod as Against All Defendants)*

195.    Plaintiffs repeat and reallege the facts common to all counts and preceding paragraphs and causes of action as if set forth more fully herein.

196.    As a direct and proximate result of Defendants' liability, resulting in damages to her husband Dr. Goydos, Dr. Martins has sustained the loss or impairment of the comfort,

economic support, companionship, consortium, services and duties previously provided by her husband.

197.   As a direct and proximate result of the aforesaid conduct, Plaintiffs have been damaged, continue to be damaged, and will be damaged in the foreseeable future.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, Plaintiffs demand judgment against Defendants, jointly and severally, awarding actual damages (past and present), future damages, treble damages, punitive damages, statutory damages, economic damages, compensatory damages, emotional distress damages, civil fines, injunctive relief, reinstatement of employment and/or lost wages, benefits, and other renumeration, reinstatement of full fringe benefits and seniority, reinstatement of tenure, declaratory relief, reasonable attorney's fees, costs of suit, interest, and such other and further relief as this Court deems necessary and just.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by a jury.

Respectfully submitted,
BLICK LAW LLC

By:   s/ SHAUN I. BLICK, ESQ.
Shaun I. Blick, Esq.

Dated: March 27, 2019