**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JAMES S. GOYDOS and MARIA E. MARTINS,<br><br>                Plaintiffs,<br><br>        v.<br><br>RUTGERS, THE STATE UNIVERSITY *et. al.*,<br><br>                Defendants. | Civil Action No. 19-08966 (MAS) (DEA)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on Defendant Rutgers, the State University a/k/a Rutgers, the State University of New Jersey a/k/a Rutgers, Rutgers Cancer Institute of New Jersey ("RCINJ") (collectively, the "Rutgers Defendants"), Steven K. Libutti ("Dr. Libutti"), Brian L. Strom ("Dr. Strom"), Timothy J. Fournier ("Fournier"), and Eugene Simon's ("Simon") Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC"). (ECF No. 71.) Plaintiffs opposed (ECF No 72), and Defendants replied (ECF No. 73). The Court has carefully considered the parties' submissions and now decides the matter without oral argument pursuant to Local Civil Rule 78.1.

## I.     BACKGROUND

Plaintiff James S. Goydos ("Dr. Goydos") is a former tenured medical school professor and researcher who was employed by the Rutgers Defendants. (SAC ¶¶ 2, 24, ECF No. 69.) Maria E. Martins ("Martins") is his wife. (*Id.* ¶ 1.) According to the SAC, Dr. Goydos is the victim of an

extensive conspiracy that falsely criminally implicated him, all in retaliation for whistleblowing activity in 2014 and 2017. (*See generally id.* ¶¶ 1, 170-205.) Defendants, on the other hand, paint an entirely different picture and allege that Dr. Goydos engaged in criminal conduct in the workplace and now brings this action against his former employer and colleagues despite his egregious misconduct. (Defs.' Moving Br. 1, ECF No. 71.) The SAC encompasses a smorgasbord of factual allegations and claims that the Court will distill for the purposes of this Memorandum Opinion.

### A.    Inaccuracies in Grant Applications

In 2014, Dr. Goydos was a grant reviewer at Rutgers for the National Cancer Institutes ("NCI") and prepared grant applications throughout the year. (SAC ¶ 169.) The grant application process included preparation of a budget, which contained salary support details for the faculty and staff involved in the proposed research efforts. (*Id.* ¶ 171.) That year, Dr. Goydos applied for a new grant that would fund 20% of Dr. Goydos's base salary support. (*Id.* ¶ 173.) At the time, previously awarded grants were already funding approximately 60% of Dr. Goydos's base salary support. (*Id.* ¶ 172.) The new grant would fund an additional 20% of Dr. Goydos's base salary, for a total of 80% of Dr. Goydos's salary funded by his research efforts. (*Id.* ¶¶ 173-74.) Additionally, Dr. Goydos was assigned 20% equivalent effort for his clinical work. (*Id.* ¶ 175.) Therefore, the 80% salary support derived from research funding and the 20% derived from clinical work together would account for 100% of Dr. Goydos's efforts. (*Id.* ¶ 176.)

After completing the grant application and submitting it to RCINJ's Finance Department for review, Dr. Goydos was informed that the grant application's 20% salary support would result in his total effort exceeding 100%, in violation of the National Institute of Health's rule. (*Id.* ¶¶ 179, 182-83.) It turned out that there was a discrepancy between the Finance Department records,

which assigned Dr. Goydos approximately 50-60% full time equivalent effort for his clinical work, and his personal records, where he documented that his clinical work accounted for 20% salary effort. (*Id.* ¶¶ 180-81.)

After reviewing the numbers, Dr. Goydos discussed the discrepancy with his superior at the time, Dr. Howard Kaufman ("Dr. Kaufman"), who confirmed Dr. Goydos's accounting. (*Id.* ¶¶ 168, 184-85.) Dr. Goydos then told Dr. Kaufman that if he were to submit the grant to the NCI, it would constitute fraud because of the incorrect numbers. (*Id.* ¶ 186.) Dr. Kaufman then brought the discrepancy to the attention of RCINJ leadership, but Dr. Goydos stated that he heard from one of the meeting attendees that Dr. Kaufman reported that Dr. Goydos was accusing the Rutgers Defendants of fraud, as opposed to making a simple mistake. (*Id.* ¶¶ 188-89.) Dr. Goydos then reported the funding issue to the Rutgers Defendants' investigator. (*Id.* ¶ 191.)

Fast-forward nearly three years and in February 2017, at a meeting with Dr. Libutti, then the Director of RCINJ, Dr. Goydos reiterated his concern over the discovered discrepancy. (*Id.* ¶¶ 193-94.) He stated that grant applications based on the incorrect numbers "could give rise to fraud upon NCI and Robert Wood Johnson University Hospital." (*Id.* ¶ 195.) Dr. Goydos alleges that after that meeting, he was told that "Dr. Libutti described him as a negative force at RCINJ." (*Id.* ¶ 196.) Plaintiffs next allege that the Rutgers Defendants, including administrators like Dr. Libutti, labeled Dr. Goydos as a troublemaker. (*Id.* ¶ 205.)

Dr. Goydos then alleges he was retaliated against several times because he raised concerns over the funding discrepancy. First, Dr. Goydos claims he was targeted by an internal investigation after it was reported by a janitorial staff member that he was observed going into the director's suite to get a cup of coffee one evening while working late. (*Id.* ¶ 206.) Second, the SAC states that it was "alleged that a memorandum had been placed into Dr. Goydos's employment file stating

3

falsely that he had been disparaging RCINJ," though the SAC does not make clear who alleged this. (*Id.* ¶ 208.) Third, RCINJ allegedly increased Dr. Goydos's full time equivalent status from 20% to 40% without explanation, which resulted in a decrease to Dr. Goydos's bonus each year. (*Id.* ¶¶ 209-10.) Finally, the SAC alleges Dr. Goydos was retaliated against through a workplace misconduct investigation that ended his employment at Rutgers, as described more fully below. (*Id.* ¶¶ 119-25, 235-36.) Defendants dispute the SAC's retaliation claims, bolstered by Dr. Goydos's ultimate indictment, guilty plea and sentencing from conduct revealed from an investigation.[1] (Defs.' Moving Br. 4.) The Defendants indicate that Dr. Goydos's is "blame-shifting . . . his own criminal and other improper conduct in the workplace." *Id.*

**B.      Investigation of Camera in RCINJ's Women's Bathroom**

On September 20, 2017, the Middlesex County Prosecutor's Office ("MCPO") and the Rutgers University Police Department ("RUPD") discovered a hidden video camera in the second-floor women's restroom at RCINJ. (SAC ¶ 74.) Although the investigation initially focused on Dr. Libutti, the SAC alleges that thereafter, Dr. Libutti and his attorneys hired private investigators that then began to investigate Dr. Goydos "[u]nder color of state law." (*Id.* ¶¶ 86-88.) On October 2, 2017, Dr. Libutti directed members of the Rutgers IT Department to secretly obtain images of Dr. Goydos's computer. (*Id.* ¶ 89.) That same day, a Rutgers IT representative received a call from

---

[1] The Court notes that it may properly consider any exhibit integral to the complaint or matters of public record. "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted). The Court, however, may consider such matters "without converting the motion [to dismiss] into one for summary judgment" when those matters are "*integral to or explicitly relied* upon in the complaint." *Id.* (alteration in original) (citation omitted); *see also Bolick v. Pennsylvania*, 473 F. App'x 136, 138 (3d Cir. 2012) ("[W]hen ruling on a motion to dismiss, a court is permitted to look to matters of public record, including 'criminal case dispositions . . . '" (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192. 1197 (3d Cir. 1993)).

the Chief Administrative Officer asking him to discreetly preserve Dr. Goydos's computer. (*Id.* ¶¶ 90-91.) On October 9, 2017, Dr. Libutti asked the Rutgers IT representative to put a hold on Dr. Goydos's e-mail messages. (*Id.* ¶ 99.) The Rutgers IT representative then emailed the Office of General Counsel ("OGC") and made the request on behalf of Dr. Libutti. (*Id.* ¶ 101.) The OGC responded that it was unaware of any investigation and, subsequently, the RUPD directed the Rutgers IT representative to terminate his efforts in furtherance of the alleged investigation. (*Id.* ¶¶ 102-103.)

On November 1, 2017, the Rutgers Defendants officially began to investigate Dr. Goydos for the camera placed in the women's bathroom. (*Id.* ¶ 108.) A few days later, on November 6, 2017, officials from the Rutgers Compliance Office informed Dr. Goydos that "they were going to make a forensic image of his office computer and that they were confiscating his" work-issued cell phone, though he was not yet informed of the purpose of the investigation. (*Id.* ¶¶ 111-12.) Sometime thereafter, it appears that Dr. Goydos hired legal counsel. (*See id.* ¶ 113.)

On February 15, 2018, outside counsel for the Rutgers Defendants requested that Dr. Goydos appear for an interview as part of an internal investigation into certain "events at [RCINJ]," but still did not disclose the subject of the investigation.  (*Id.* ¶¶ 113-14.) As a result, Dr. Goydos ultimately refused two requests for an interview, but offered to answer any written question posed, subject to "appropriate procedural safeguards, protections and reserving the right to raise privilege or applicable objections." (*Id.* ¶¶ 115-17.) The Rutgers Defendants refused Dr. Goydos's proposal. (*Id.* ¶ 118.) Dr. Goydos alleges that outside counsel for the Rutgers Defendants demanded that he sit for an interview or otherwise face employer discipline or criminal charges. (*Id.* ¶ 119.) Dr. Goydos then learned that the investigation centered around the camera placed in the women's second-floor bathroom at RCINJ. (*Id.* ¶ 121.)

Around this time, Dr. Goydos was confronted outside his home by MCPO detectives and taken to the police station for questioning and a sworn statement. (*Id.* ¶ 122.) Dr. Goydos maintained that he had no knowledge that was relevant to the camera incident. (*Id.* ¶ 123.) But Defendants claimed that their investigation uncovered that Dr. Libutti's suite was broken into and that records of Dr. Goydos's key fob swipes into the RCINJ building and his parking records indicated that Dr. Goydos was in the building, inculpating Dr. Goydos. (*Id.* ¶¶ 124-25.)

On March 16, 2018, Defendants sent copies of the forensic examination of Dr. Goydos's computer and cell phone to an MCPO detective. (*Id.* ¶ 127.) On March 29, 2018, that detective authored an affidavit in support of a search warrant. (*Id.* ¶ 128.) The next day, investigators from the MCPO, along with other law enforcement agencies, executed a search warrant on Plaintiffs' home. (*Id.* ¶ 45.) During the search, investigators discovered a sealed bag containing a rifle. (*Id.* ¶ 47.) Dr. Goydos was placed under arrest and was processed on a charge of possession of an unlicensed gun. (*Id.* ¶ 49; Bennett Certif. Ex. A, at *41, ECF No. 71-2.)[2]

While Dr. Goydos was being processed for his arrest, RUPD served Dr. Goydos with a letter from the Rutgers Defendants and Dr. Strom, Chancellor of Rutgers Biomedical and Health Sciences and the Executive Vice President for Health Affairs at Rutgers, placing Dr. Goydos on administrative leave. (*Id.* ¶¶ 8, 50-51.) Dr. Goydos, thereafter, lodged an objection regarding the Rutgers Defendants and Dr. Strom's actions. (*Id.* ¶ 56.) The Rutgers Defendants responded by reaffirming the letter and its terms, as well as indicating that Rutgers was conducting its own investigation into the events occurring at RCINJ in the fall of 2017. (*Id.* ¶¶ 58-59.) Over eight months later, on December 7, 2018, counsel for Rutgers advised Dr. Goydos's counsel that they

---

[2] Page numbers preceded with an asterisk reference the page numbers at the top of the ECF filing.

were commencing de-tenuring proceedings. (*Id.* ¶ 63.) Dr. Goydos then resigned from Rutgers and RCINJ effective December 14, 2018. (*Id.* ¶ 64.)

On December 28, 2018, Dr. Goydos was indicted by a Middlesex County Grand Jury on 160 counts that included burglary, computer theft, impersonation, official misconduct, Wiretap Act violations, invasion of privacy, falsely implicat[ing] another, criminal coercion, hiding apprehension, possession of an assault rifle, possession of a prohibited device, and pattern of official misconduct. (*Id.* ¶ 65; Bennett Certif. Ex. A.) On December 19, 2019, Dr. Goydos, pursuant to a plea offer, pled guilty to six counts in total, in exchange for dismissal of the remaining counts.[3] (*Id.* ¶ 152; Bennett Certif Ex. B, at *47.) As part of the plea agreement, Dr. Goydos admitted that he accessed computers at RCINJ, without authorization, to obtain information that he was not entitled to for his own benefit. Dr. Goydos also admitted to accessing information using one of the victim's log-in information to make it seem like the victim was accessing the information. (Bennett Certif. Ex. B, at *55-56.) On July 7, 2020, Dr. Goydos was sentenced to 300 days in jail, four years of probation, community service, no contact with Rutgers or the RCINJ, forfeiture of future public employment in New Jersey, the inability to possess firearms, and monetary fines. (SAC ¶ 153; Bennett Certif., Ex. I, at *129.)

Plaintiffs filed this suit on March 27, 2019. On February 1, 2021, Plaintiffs filed the SAC alleging: (1) violation of Plaintiff Goydos's First, Fourth, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983; (2) violation of the New Jersey Conscientious Employee Protection Act; (3) intentional infliction of emotional distress; (4) conversion; (5) breach of contract; and (6) a *per quod* claim by Plaintiff Martins.

---

[3] Dr. Goydos pled guilty to burglary, two counts of computer theft, impersonation, official misconduct and possession of an assault rifle. (*See* Bennett Certif. Ex. B, at *47.)

## II.     LEGAL STANDARD

District courts undertake a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). In doing so, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

## III.    DISCUSSION

### A.     Section 1983 Claims

A plaintiff can pursue a cause of action under Section 1983 for certain violations of his constitutional rights.[4] Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory. . . subjects, or causes to be subjected, any citizen of the United States or other person within

---

[4] The Court notes, however, that Plaintiffs are barred from any Section 1983 claim "that would necessarily imply the invalidity of [Dr. Goydos's] conviction." *See Bolick*, 473 F. App'x at 138 (citing *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)). Though the parties submitted extensive briefing, none of it addressed whether any of Plaintiff's Section 1983 claims imply the invalidity of Dr. Goydos's guilty plea, such that the claim is barred. At this time, therefore, the Court declines to address whether any of Plaintiffs' Section 1983 claims are barred under the *Heck v. Humphrey* standard.

> the jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be liable
> to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . .

42 U.S.C. § 1983. To state a claim for relief under Section 1983, a plaintiff must establish, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Morrow v. Balaski*, 719 F.3d 160, 166 (3d Cir. 2013) (citation omitted). Plaintiffs allege constitutional violations of Dr. Goydos's First, Fourth, Fifth and Fourteenth Amendment rights. (*See generally* SAC ¶¶ 219-317.) Plaintiffs also allege a civil rights conspiracy. (*See generally id.* ¶¶ 318-28.) The Court addresses these claims below.

### 1. First Amendment

Plaintiffs assert that the Rutgers Defendants, Dr. Libutti, and Dr. Strom violated Dr. Goydos's First Amendment rights. (SAC ¶¶ 219-244.) Plaintiffs allege that (1) Dr. Goydos "engaged in speech protected by the First Amendment" when he "disclos[ed] apparent illegality by the Rutgers Defendants, in his capacity and as a citizen, involv[ing] a matter of significant public concern and importance" (*id.* ¶¶ 227-28), and (2) Dr. Goydos was retaliated against in multiple different fashions because of that protected speech. (*Id.* ¶¶ 230-39.) Defendants argue that Plaintiffs fail to state that Dr. Goydos engaged in any activity protected by the First Amendment. (Defs.' Moving Br. 9.) In any event, Plaintiffs' SAC fails to state a "causal connection" between Dr. Goydos's alleged speech and any alleged retaliatory claims. (*Id.* at 10.)

In order to establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to

the employer to prove that (3) the same action would have been taken even if the speech had not

occurred.[5] *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014) (citing *Gorum v.*

*Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)). Generally, a public employee's speech is protected

by the First Amendment when "(1) in making it, the employee spoke as a citizen[;] (2) the

statement involved a matter of public concern[;] and (3) the government employer did not have

'an adequate justification for treating the employee differently from any other member of the

general public' as a result of the statement he made." *Falco v. Zimmer*, 767 F. App'x 288, 300 (3d

Cir. 2019) (alteration in original) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d

Cir. 2006)). The Supreme Court held in *Garcetti* that a public employee does not speak "as [a]

citizen" when he makes a statement "pursuant to [his] official duties." *Garcetti v. Ceballos*, 547

U.S. 410, 421 (2006). "Whether an employee's speech addresses a matter of public concern must

be determined by the content, form, and context of a given statement, as revealed by the whole

record." *Rankin v. McPherson*, 483 U.S. 378, 384-85 (1987) (quoting *Connick v. Myers*, 461 U.S.

138, 147–48 (1983)).

The Court finds that Plaintiffs did not adequately plead that Dr. Goydos's speech addressed

a matter of public concern protected by the First Amendment. Dr. Goydos claims that the SAC

pleads that he engaged in constitutionally protected conduct when he reported to his superiors (and

an investigator for Defendants) what he "believed to be misappropriation and fraud" in 2014 and

2017. (*See* SAC ¶¶ 194-95, 224-227; Pls.' Opp'n Br. 5, ECF No. 72.) But the SAC only alleges

that Dr. Goydos raised specific concerns regarding discrepancies in his own salary allocation

efforts, not fraud or misappropriation at RCINJ generally. *Gorman v. Rensselaer Cnty.*, 910 F.3d

---

[5] The Court notes that Plaintiffs and Defendants both misstate the standard as it applies to public employees. *See Falco v. Zimmer*, 767 F. App'x 288, 298-99 (3d Cir. 2019) (citation omitted) (applying the standard articulated above because the plaintiff was a public employee).

40, 45 (2d Cir. 2018) ("[S]peech that primarily concerns an issue that is personal in nature and generally related to the speaker's own situation, such as his or her assignments, promotion, or salary, does not address matters of public concern.") (citation omitted); *Lee v. Cnty. of Passaic*, No. 09-5735, 2011 WL 3159130, at *4 (D.N.J. July 26, 2011) (finding that plaintiff did not engage in protected activity because "concerns over personal salaries and benefits cannot be said to 'relat[e] to another matter of political, social, or other concern to the community' . . . [and are] not protected under the First Amendment") (quoting *Myers*, 461 U.S. at 140 ). The Third Circuit has also "consistently held that complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties." *Morris v. Philadelphia Hous. Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012). Here, Dr. Goydos's speech was only to his superiors concerning his individual salary effort allocation.

Dr. Goydos claims that reviewing and confirming the accuracy of grant figures was not an official duty of his, and instead, he was acting as a concerned citizen in a matter of significant public concern. (SAC ¶¶ 226-27.) But this assertion misses the mark. As *Garcetti* explains, "the 'proper inquiry' into what are an individual's official duties 'is a practical one.'" *Gorum*, 561 F.3d at 185 (quoting *Garcetti*, 547 U.S. at 424). As the Supreme Court acknowledged, "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Garcetti*, 547 U.S. at 424. The proper inquiry, therefore, is that a "claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job." *Gorum*, 561 F.3d at 185 (citation omitted). Here, while Dr. Goydos's official duties may not have included reviewing the accuracy of grant figures, Dr. Goydos was responsible for regularly submitting accurate grant applications and even discovered this

discrepancy while doing so. (*See generally* SAC ¶¶ 169-86, 224-27.) Thus, the Court does not find plausible that he was simply acting as a citizen, and not a public employee, in this instance. Because Plaintiffs cannot satisfy the first prong, that Dr. Goydos spoke as a citizen and therefore his speech is protected, the Plaintiffs First Amendment claim fails.

### 2.    Fourth Amendment

Next, Plaintiffs allege that Defendants violated Dr. Goydos's constitutional rights under the Fourth Amendment. First, Plaintiffs allege that Dr. Libutti directed a Rutgers IT representative to create images of Dr. Goydos's office computer in furtherance of an investigation that was not yet started by Rutgers or any other entity. (*Id.* ¶ 252.) Second, Plaintiffs allege that thereafter, officials from the Rutgers Compliance Office made forensic images of his office computer and confiscated his university-issued cell phone. (*Id.* ¶ 262.) Plaintiffs allege that these two instances were warrantless searches and seizures. (*Id.* ¶ 264.) Plaintiffs also claim that members of the Rutgers University Office of Ethics and Compliance surveilled Plaintiffs' home, at the direction of Fournier and Simon. (*Id.* ¶¶ 265-66.) Fournier and Simon occupied top positions in the Office. Plaintiffs claim that the Rutgers Defendants, Dr. Libutti, Fournier, and Simon, were "clothed with the authority of the MCPO and RUPD and deputized for the purpose of pursuing evidence in furtherance of a criminal investigation[.]" (*Id.* ¶ 279.) The implication of which is that this was not simply a search by an employer, but instead, a warrantless search and seizure that resulted in illegally obtained evidence which was used to criminally prosecute Dr. Goydos. Defendants respond to these arguments by stating that Plaintiff's SAC fails to plead facts that the search performed by the Rutgers Defendants was for any purpose other than the "investigation of [Dr. Goydos's] work-related misconduct." (Defs.' Moving Br. 12 (citation omitted).)

The Fourth Amendment prohibits "unreasonable" searches and seizures. U.S. Const. Amend. IV. The Supreme Court has previously held that the Fourth Amendment extends to

searches and seizures by "government employers or supervisors of the private property of their employees." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987). To invoke the protections of the Fourth Amendment, an employee must show that the conduct infringed "an expectation of privacy that society is prepared to consider reasonable.'" *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). The Supreme Court's decision in *City of Ontario v. Quon* reiterated the principle set forth in *O'Connor* that "where an employee has a legitimate privacy expectation, an employer's intrusion on that expectation 'for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances.'" *City of Ontario v. Quon*, 560 U.S. 746, 757 (2010) (quoting *O'Connor*, 480 U.S. at 725-26). "This rule is consistent with the nature of an employer-employee relationship and reflects an understanding that, although employees may have certain privacy interests in their work-related documents and communications vis-à-vis outsiders, their privacy interests vis-à-vis their employer are far more circumscribed." *Walker v. Coffey*, 905 F.3d 138, 148 (3d Cir. 2018).

Here, the Court finds that the November 6, 2017 forensic image of Dr. Goydos's office computer and the seizure of his University-issued cell phone were part of an investigation into workplace misconduct and that this search was reasonable. *See Quon*, 560 U.S. at 761. Construing the pleadings in the light most favorable to Plaintiffs, the search and seizure occurred because of alleged workplace misconduct. The SAC discloses that the November 6, 2017 search and seizure occurred at the behest of officials from the Rutgers Compliance Office, following the start of an investigation into a hidden video camera placed in a women's restroom at RCINJ. (SAC ¶ 71.) As Dr. Goydos admits, the results of forensic examinations of his computer and cell phone became the basis of a search warrant and Dr. Goydos was indicted in connection with the misconduct,

meaning that both a judge and grand jury found probable cause based on the evidence found in the investigation. (*Id.* ¶¶ 127-28, 151.) As Plaintiffs state, "information gathered from the flawed investigation . . . was turned over to prosecutors and police who then secured search warrants supported by affidavits based on cherry-picked information gathered through their investigation efforts." [6] (*Id.* ¶ 44.)

Plaintiffs argue that Dr. Goydos objected to the "warrantless search and seizure because he maintained protected information, personal data, and personal photos on the devices" and thus "he had a reasonable expectation of privacy". (Pls.' Opp'n Br. 10.) This argument, however, misses the mark, too. As a matter of law, this issue was squarely addressed in *O'Connor v. Ortega*. There, hospital officials searched and seized personal items from the respondent's office desk and file cabinets that were then used in administrative proceedings resulting in his discharge. *See O'Connor*, 480 U.S. at 712-14. The Court held that "a search of an employee's office by a supervisor will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct." *Id.* at 726. While Dr. Goydos may have had a reasonable expectation of privacy, that expectation did not extend so far as to prohibit an investigation into workplace misconduct. *See id.* The Court, therefore, finds that the November 6, 2017 image of Dr. Goydos's office computer and seizure of his cellphone do not give rise to Fourth Amendment violations.

---

[6] Plaintiffs also argue that Defendants "served up to state prosecutors and police on a silver platter otherwise innocuous information" and that this conduct is "clearly unreasonable." (Pls.' Opp'n Br. 11.) But Plaintiffs argument flies in the face of the fact that Dr. Goydos admitted on the record that he was, in fact, guilty of workplace misconduct. (*See* Bennett Certif., Ex. B, at *52-57.) The Court, therefore, denies Plaintiffs their factually unsupported framing of Defendants' conduct and the course of events.

The Court, however, finds that the allegations regarding the October 2, 2017 imaging of Dr. Goydos's work computer are sufficient to raise a Fourth Amendment claim. While the Supreme Court has made clear that investigations into workplace misconduct may not violate the Fourth Amendment, *see O'Connor*, 480 U.S. at 726, the Plaintiffs sufficiently allege in their SAC that it is not so clear that on October 2, 2017, there were reasonable grounds for suspecting the search would uncover misconduct by Dr. Goydos and that he had a reasonable expectation of privacy at that time. (*See* SAC ¶¶ 89-103.) Because this is a motion to dismiss, the Court cannot consider that Rutgers expressly "reserved the right to examine material stored on or transmitted through its information technology facilities if there is reason to believe … law or university policy are being violated." (Bennett Certif. Ex. A, *7, ECF No. 73-1.) *See Cronce v. Tristate Erosion Control Co. Inc.*, No. 14-3397, 2014 WL 5529372, at *2 (D.N.J. Nov. 3, 2014) ("[I]n ruling on a Rule 12(b)(6) motion to dismiss, a district court may not consider matters extraneous to the pleading."). Construing the pleadings in the light most favorable to Plaintiffs, the Court finds that the SAC pleads enough facts to state a claim for relief. The Court, therefore, denies dismissal of the Plaintiffs' Fourth Amendment claim on this basis.

The Court, however, will dismiss Dr. Libutti from this claim under the doctrine of qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Walker*, 905 F.3d at 143 (quoting *Taylor v. Barkes*, 575 U.S. 822, 825 (2015)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Walker*, 905 F.3d at 143 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). To resolve a claim of qualified immunity, courts engage in a two-pronged inquiry: "(1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was

'clearly established' at the time of the official's conduct." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

The Supreme Court has "repeatedly... stressed the importance of resolving qualified immunity questions at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 232 (citation omitted). While Plaintiffs only need to plausibly allege an argument to sustain their Fourth Amendment claim, to sustain a claim against someone in their individual capacity, Plaintiffs must allege that their constitutional right was clearly established. Here, Plaintiffs fail to allege the constitutional right was clearly established. The Court, therefore, will dismiss Dr. Libutti from the Fourth Amendment claim.

### 3. Fifth Amendment

Plaintiffs next allege that the Rutgers Defendants' repeated demands that Dr. Goydos appear for a deposition-like interview as part of an internal investigation, under the threat of employer discipline and possible criminal implications, deprived him of his right against self-incrimination under the Fifth Amendment. (SAC ¶¶ 292-97; Pls.' Opp'n Br. 15-16.) Defendants argue in response that this claim fails because Dr. Goydos does not allege he made any "communication" that was "compelled" by Defendants. (Defs.' Moving Br. 13.) Defendants, therefore, argue that the SAC fails to state a viable Section 1983 claim based on an alleged Fifth Amendment violation.

"The [Fifth] Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). In a series of cases involving the Fifth Amendment rights of public employees, the Supreme Court has made clear that public employees cannot be compelled to choose between

providing unprotected incriminating testimony or losing their jobs. *See Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280, 284 (1968); *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977) ("Government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized").

The Amendment is violated when public employees are compelled to testify by employers who require the employees to either incriminate themselves or to forfeit their jobs. *See Garrity v. New Jersey*, 385 U.S. 493, 497–98 (1967); *Uniformed Sanitation Men Ass'n*, 392 U.S. at 284. If a public employer, however, does not demand that the public employee relinquish the employee's constitutional immunity from prosecution, the employee can be required to either testify about his performance of official duties or to forfeit employment. *See Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) (citing *Uniformed Sanitation Men Ass'n*, 392 U.S. at 284); *Gulden v. McCorkle*, 680 F.2d 1070, 1074 (5th Cir.1982). Given "the important public interest in securing from public employees an accounting of their public trust[,] [p]ublic employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity." *Lefkowitz*, 431 U.S. at 806 (citing *Gardner v. Broderick*, 392 U.S. 273, 278-79 (1968)).

To illustrate, in *Hill v. Johnson*, an officer was ultimately terminated after he refused to answer questions about the disappearance of a photograph and failed to show up for a polygraph examination. *See Hill*, 160 F.3d at 470. The officer then alleged that the Sheriff had violated his Fifth Amendment rights when the Sheriff discharged him. *Id.* The Eighth Circuit disagreed, ruling that the officer's allegations failed to allege the violation of a clearly established Fifth Amendment right and that the Sheriff was entitled to qualified immunity. *Id.* at

472. The court explained that the Fifth Amendment is violated "only by the combined risks of both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers." *Id.* at 471 (citing *Harrison v. Wille* 132 F.3d 679, 682 (11th Cir. 1998)). Thus, a public employer may put a public employee to the choice of either testifying about the performance of official duties or forfeiting her job "[a]s long as a public employer does not demand that the public employee relinquish the employee's constitutional immunity from prosecution *Id.* Accordingly, since the officer had not been asked to waive his privilege against self-incrimination, his dismissal did not violate the Fifth Amendment. *Id.* at 471-72.

Applying these principles here, the Court finds Plaintiffs have plausibly alleged a claim under the Fifth Amendment. The Rutgers Defendants were entitled to request that Dr. Goydos appear for an interview. Indeed, the Rutgers Defendants were investigating serious workplace misconduct, rising to the level of criminal conduct, regarding the video camera placed in the women's bathroom. (*See* SAC ¶ 288.) Dr. Goydos, however, could not have been compelled to answer questions that required him to waive any privileges or rights under the threat of termination. *See Garrity*, 385 U.S. at 497-98. As the Seventh Circuit articulated, a public employer "has every right to investigate allegations of misconduct, including criminal misconduct by its employees." *Atwell v. Lisle Park Dist.*, 286 F.3d 987, 990 (7th Cir. 2002). But the case law is also clear that a public employer "is not even allowed to pressure [a public employee] into cooperating by threatening to fire him. . . for refusing to provide" a statement that might implicate him in a crime. *Id.* (noting that "if it does that it must give [the employee] immunity from criminal prosecution on the basis of [his or her] answers."). Here, Plaintiffs allege that the Rutgers Defendants "demanded" Dr. Goydos be interviewed "*in furtherance of* a criminal investigation." (SAC ¶ 292 (emphasis

added).) And Plaintiffs allege that his offer "to answer any written questions posed, subject to appropriate procedural safeguards, protections, and reserving the right to raise privilege or applicable objections" was declined. (*Id.* ¶¶ 117-18.) Though it is not clear that the Rutgers Defendants declined this offer because of the safeguards requested, or because they preferred a live interview, the Court finds that Plaintiffs have alleged enough facts to state a claim to survive a motion to dismiss. The Court, therefore, denies the motion to dismiss on this ground.

### 4.   Fourteenth Amendment

Plaintiffs' final Section 1983 argument is that Dr. Goydos had a protected property right and interest in his employment and a liberty right and interest in his professional reputation that Dr. Goydos was deprived of by the Defendants. (SAC ¶¶ 306-07.) Specifically, Plaintiffs argue that Dr. Goydos was placed on administrative leave for nine months with no hearing, but he was eventually informed that de-tenuring proceedings would be commenced. (*Id.* ¶ 308.) As a result, Dr. Goydos resigned and now claims he was constructively discharged from his tenured employment. (*Id.* ¶¶ 310-11.)  Plaintiffs also claim that the Rutgers Defendants, Dr. Libutti and Dr. Strom created and disseminated a false and defamatory impression about Dr. Goydos in connection with his termination. (*Id.* ¶¶ 312-13.)

### a.   *Property Interest*

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. To state a claim for a violation of due process rights, a Plaintiff must allege that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Falco*, 767 F. App'x at 315 (quoting *Hill*, 455 F.3d at 233-34). Here, Plaintiffs allege two distinct claims that Dr. Goydos was deprived of his property interest in his employment: (1) that

he was deprived of his property interest when he was placed on administrative leave for nine months without the opportunity for a hearing, and (2) that he was constructively discharged, permanently depriving him of his property interest in his employment. (Pls.' Opp'n Br. 17.)

The Court first turns to whether Dr. Goydos adequately alleged that he was deprived of sufficient due process when he was placed on administrative leave without a hearing. Defendants argue that "due process protections are not implicated where an employee is paid while on leave." (Def.'s Moving Br. 15.) Due process usually requires that an individual receive a hearing before he is deprived of an interest. *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997). That rule, however, is not absolute. *See id.* For example, a hearing may be postponed in "'extraordinary situations where some valid governmental interest is at stake...'" *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 568 n.7 (1972) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).  The Supreme Court has articulated three factors that must be balanced when determining whether there has been sufficient process: (1) the private interest at stake, (2) the risk of "erroneous deprivation" and the value of alternative procedures, and (3) the government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The Court finds that Plaintiffs do not sufficiently allege a due process violation claim when Dr. Goydos was suspended *with pay* from March 30, 2018 until he resigned on December 14, 2018. As the SAC concedes, on March 30, 2018, the Middlesex County Prosecutor's Office executed a search warrant on the defendant's house, relying, in part, on a copy of a "forensic examination of Dr. Goydos's [office] computer and [University-issued] cell phone performed by Defendants." (SAC ¶¶ 45-46.) Dr. Goydos was arrested that day, and thereafter, placed on administrative leave. (SAC ¶ 49.) Here, the Court finds that while Dr. Goydos had an interest in his continued employment, the property interest implicated was diminished because he was placed

on leave with pay. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985) (suggesting that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the [due process] problem by suspending with pay."). Moreover, the Court also finds that the Rutgers Defendants had an overwhelming interest considering the serious misconduct that occurred when it: (1) found a camera placed in the women's restroom, (2) embarked on an investigation that potentially implicated Dr. Goydos, and (3) the results of that investigation were the partial basis of a search warrant that was executed. *Jerrytone v. Musto*, 167 F. App'x 295, 301 (3d Cir. 2006) ("Given the minimal property interest involved, [Plaintiff's] due process rights were not violated when he was placed on paid suspension without a prior hearing after allegations of serious misconduct and criminal activity in his classroom arose from credible sources."). The Court thus finds that Plaintiffs do not state a claim for relief on this basis.

The Court next turns to Plaintiffs' claim that Dr. Goydos was constructively discharged and, thus, deprived of his property interest in his employment in violation of the Fourteenth Amendment. (Pls.' Opp'n Br. 17.) Defendants allege that Plaintiffs' claim of constructive discharge fails because the SAC contains "no allegations stating how Plaintiff Goydos's paid administrative leave or the potential start of de-tenuring proceedings subjected him to working conditions so unendurable that he was compelled to resign." (Defs.' Moving Br. 16.) The Third Circuit has deemed that a resignation will be deemed a constructive discharge, and within the protections of the due process clause under two circumstances: "(1) when the employer forces the employee's resignation or retirement by coercion or duress, or (2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee." *Hill*, 455 F.3d at 233 n.10 (quoting *Leheny v. City of Pittsburgh*, 183 F.3d 220, 228 (3d Cir. 1999)). If an employee resigns of his own "free will", however, the Third Circuit has ruled that "even though

prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights." *Leheny*, 183 F.3d at 227 (citations omitted).

Courts in this circuit have considered the following factors in determining whether there was a constructive discharge pursuant to coercion or duress:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice [h]e was given; (3) whether the employee had a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of resignation; and (5) whether the employee had the advice of counsel.

*Errington v. City of Reading*, No. 21-118, 2021 WL 3885177, at *5 (E.D. Pa. Aug. 31, 2021) (citing *Judge v. Shikellamy Sch. Dist.*, 905 F.3d 122, 125-26 (3d Cir. 2018)). The objective test for whether Defendant was constructively discharged due to misrepresentation is if "[d]efendants misrepresented a material fact upon which Plaintiff reasonably relied when deciding to retire." *Balik v. City of Bayonne*, No. 10-4145, 2013 WL 12091322, at *4 (D.N.J. Feb. 20, 2013), *aff'd*, 567 F. App'x 86 (3d Cir. 2014). A court may also find a resignation involuntary "if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation." *Benson v. Cooke*, No. 15-858, 2016 WL 1562898, at *3 (D. Del. Apr. 15, 2016) (quoting *Hargray v. City of Hallandale*, 57 F.3d 1560, 1570 (11th Cir. 1995)).

Here, the Court also finds that Plaintiffs do not allege plausible facts to sustain a claim that Dr. Goydos was constructively discharged by coercion or misrepresentation. First, the Court finds that the Plaintiffs do not allege facts that, even when construed in their favor, indicate that Dr. Goydos was coerced into resigning. Dr. Goydos was presented with and understood the alternative

to resignation, which was to proceed through the de-tenuring process.[7] Indeed, the SAC does not indicate that Dr. Goydos was provided a deadline by which he had to choose resignation or face de-tenuring procedures. Quite the opposite, Dr. Goydos selected the date of his resignation. (*See* SAC ¶ 310; Defs.' Moving Br. 17.) And finally, Dr. Goydos was represented by counsel at the time that he decided to resign.

Nor does the Court find that the Plaintiffs allege any facts that indicate that Dr. Goydos resigned because of any misrepresentation of material fact. The Court, therefore, finds that the property interest claim under the Fourteenth Amendment fails.

### b.   *Liberty Interest*

Plaintiffs allege that the Rutgers Defendants, Dr. Libutti and Dr. Strom "created and disseminated a false and defamatory impression about Dr. Goydos in connection with his termination." (SAC ¶ 313.) Defendants counter that Plaintiffs' SAC does not plead a stigma to Dr. Goydos's reputation or any deprivation of some additional right or interest as required under the analysis. (Defs.' Moving Br. 18.) Defendants also argue that Plaintiffs' argument is baseless, "especially in light of the fact that Plaintiff Goydos has pled guilty to several serious crimes and been sentenced to jail." *Id.*

To state a due process claim for deprivation of liberty interest in reputation, a plaintiff must adequately allege "a stigma to his reputation plus deprivation of some additional right or interest." *Hill*, 455 F.3d at 236 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). In the context of public

---

[7] Plaintiffs contend that the de-tenuring process would "inevitably be fueled with misinformation and evidence secured by improper means." (*See* SAC ¶ 310; Pls.' Opp'n Br. 18-19.) But Plaintiffs present no facts supporting these allegations regarding the de-tenuring process. These are exactly the sort of purely conclusory allegations that the Court may ignore for purposes of deciding a motion to dismiss. *See Bradshaw v. Am. Inst. for Hist. Educ.*, No. 12-1367, 2013 WL 1007219, at *6 (D.N.J. Mar. 13, 2013).

employment, "the 'stigma-plus' test has been applied to mean that when an employer 'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest." *Id.* To satisfy the "stigma" prong, it must be alleged that the purportedly stigmatizing statement (1) was made publicly, and (2) were false. *Id.*

Plaintiffs claim that Defendants stigmatized Dr. Goydos when they "unlawfully banned him from Rutgers and RCINJ property, directed that Dr. Goydos have no contact with his colleagues, employees, and patients, and deprived him of the right to his belongings located at his workplace, under threat of criminal prosecution." (Pls.' Opp'n Br. 20.) Plaintiffs also claim that the "plus" is the loss of the protected property interest of the employment. As decided above, however, the Court finds that  Plaintiffs do not state a claim that Dr. Goydos was terminated or constructively discharged to satisfy the stigma plus test. In any event, the Plaintiffs have not alleged facts stating a claim, as a matter of law, because Plaintiffs do not allege that Defendants disseminated any statements damaging Plaintiffs' reputation. *See Yu v. U.S. Dep't of Veterans Affs.*, 528 F. App'x 181, 185 (3d Cir. 2013) (concluding that plaintiff's "claim fails because he has not produced any evidence that the allegedly false statements were disseminated"). Here, Plaintiffs do not allege that the letter placing him on administrative leave was made public. Nor do the Plaintiffs allege that the Rutgers Defendants provided any other false or defamatory impressions concerning Dr. Goydos. *McCarthy v. Darman*, 372 F. App'x 346, 351 (3d Cir. 2010) (finding publication of official meeting minutes did not constitute a stigma because the plaintiff "was suspended and the . . . [d]efendants were engaged in an on-going investigation.") Thus, Plaintiffs' liberty interest claim must fail.

### 5.   Conspiracy to Commit Civil Rights Violations

Plaintiffs allege that, as it relates to the constitutional violation claims, the Rutgers Defendants, Dr. Libutti, Dr. Strom, Simon, and Fournier "reached a mutual understanding, agreement or meeting of the minds and came to a jointly accepted plan to deprive Dr. Goydos" of his constitutional rights, as outlined in the claims relating to the First, Fourth, Fifth and Fourteenth Amendments. (SAC ¶ 324.) Defendants argue that because there is no actionable Section 1983 claim, the SAC fails to state a viable conspiracy claim. (Defs.' Moving Br. 19.) Defendants further argue that Plaintiffs fail to plead that Defendants reached an understanding to deprive Dr. Goydos of his civil rights. (*Id.*)

"To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018). A plaintiff must establish that the object of the conspiracy was the deprivation of a federally protected right. *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009) (citing *Rogin v. Bensalem Twp.*, 616 F.2d 680, 686-87 (3d Cir. 1980)). Next, the plaintiff "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Id.* To show agreement, the plaintiff must demonstrate that "the state actors named as defendants in the complaint somehow reached an understanding to deny [the plaintiff] his rights." *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993). In the absence of direct proof, a "meeting of the minds" or "understanding or agreement to conspire" can be "infer[red]" from circumstantial evidence. *See Startzell v. City of Phila.*, 533 F.3d 183, 205 (3d Cir. 2008). Such circumstantial evidence may include that the alleged conspirators "did or said something... to create an understanding," "the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy." *BanxCorp v. Bankrate,*

*Inc.*, No. 07-3398, 2011 WL 6934836, at * 10 (D.N.J. Dec. 20, 2011) (quoting *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 616 F.3d 159, 178-79 (3d Cir. 2010)). The Court is also mindful that "direct evidence of a conspiracy is rarely available." *Capogrosso*, 588 F.3d at 184.

Plaintiffs do not state a claim for relief for conspiracy to deprive Dr. Goydos of his constitutional rights. First, to the extent the Court has dismissed the constitutional claims, those cannot serve as the basis for the conspiracy claim. *See Talley v. Varner*, 786 F. App'x 326, 329 (3d Cir. 2019). Second, Plaintiffs' "facts" alleging a conspiracy are wholly conclusory. Plaintiffs allege that "the concerted and coordinated efforts, and the timing of those efforts. . . demonstrates and otherwise evidences a clear meeting of the minds as between the Defendants to conspire." (SAC ¶ 325; Pls.' Moving Br. 23.) But Plaintiffs do not allege when the agreement to conspire occurred, nor any facts to show that Defendants acted in concert to deprive Dr. Goydos of his constitutional rights. Nor do Plaintiffs allege "circumstantial evidence" such as the approximate time the agreement was made. *BanxCorp*, 2011 WL 6934836, at *10. Thus, Plaintiffs' conspiracy claim fails.

### B.      Conscientious Employee Protection Act

Plaintiffs next bring a claim under New Jersey's Conscientious Employee Protection Act ("CEPA") alleging Defendants retaliated against Dr. Goydos after he reported a discrepancy in his salary allocation between his personal records and the Finance Department records. (SAC ¶¶ 337-38.) The SAC alleges that Dr. Goydos reasonably believed this discrepancy could be "misappropriation and fraud in the submission of grant applications to the NIH." (SAC ¶¶ 186, 337.) Defendants argue that the SAC does not state that Dr. Goydos had an objectively "reasonable belief" that the discrepancies violated any particular law, rule, regulation, public policy or fraud. (Defs.' Moving Br. 26.)

CEPA requires that a plaintiff must demonstrate: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J. Stat. Ann. 34:19–3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003). CEPA covers employee complaints about activities the employee reasonably believes are: (1) in violation of a specific statute or regulation; (2) fraudulent or criminal; or (3) incompatible with policies concerning public health, safety or welfare or the protection of the environment. *See Estate of Roach v. TRW, Inc.*, 754 A.2d 544, 549 (N.J. 2000). The Court, however, only need address one factor to dispose of the CEPA claim.

Here, Plaintiffs do not allege causation under CEPA sufficient to survive a motion to dismiss. To demonstrate causation, a plaintiff must show that the "retaliatory discrimination was more likely than not a determinative factor in the decision." *Robles v. U.S. Env't Universal Servs., Inc.*, 469 F. App'x 104, 107 (3d Cir. 2012) (citing *Donofry v. Autotote Sys., Inc.*, 795 A.2d 260, 271 (N.J. Super. Ct. App. Div. 2001)). The Court finds that Dr. Goydos's placement on administrative leave and the end of his employment at Rutgers were not due to any whistleblowing activity that Dr. Goydos's allegedly engaged in when he flagged the discrepancy in the salary figures. "Retaliation may be reasonably inferred from the circumstances surrounding the employment action . . . including temporal proximity between the protected activity and the adverse action . . . and inconsistencies or contradictions in the employer's proffered legitimate reasons for its action." *Id.* As it relates to the decrease in bonus money paid, Dr. Goydos does not allege any facts demonstrating temporal proximity between his alleged whistleblowing activity

and when the decrease started or any other inconsistencies to suggest a causal connection.[8] *Griffin v. Metromedia Energy, Inc.*, No. 10-3739, 2011 WL 12872504, at *3 (D.N.J. Feb. 7, 2011) ("Plaintiff must allege some facts 'such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons.'") (citation omitted). Indeed, Courts in this district have ruled that long periods between the alleged retaliation and the activity may bar CEPA claims. *See Myer v. Spectra Gases, Inc.*, No. 09-1716, 2009 WL 2580350, at *3 (D.N.J. Aug. 18, 2009) (holding that plaintiff failed to demonstrate causation because six months passed between protected activity and termination); *Young v. Hobart W. Grp.*, 897 A.2d 1063, 1073-74 (N.J. Super. Ct. App. Div. 2005) (holding that plaintiff's termination four months after whistle-blowing activity did not, without more, suggest causal link). Here, Plaintiffs allege no facts indicating temporal proximity or any other circumstantial facts suggesting a causal link indicating that the decrease in bonus was retaliation for Dr. Goydos's whistleblowing activity. This claim, accordingly, will be dismissed.

### C.   Intentional Infliction of Emotional Distress

Plaintiffs allege that the Rutgers Defendants, Dr. Libutti, Dr. Strom, Fournier, and Simon acted intentionally and in a manner that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is to be regarded as atrocious, and utterly intolerable in a civilized community." (SAC ¶ 352.)

"To establish a viable claim of intentional infliction of emotional distress, a plaintiff must prove: (1) that defendant acted intentionally or recklessly; (2) that defendant's conduct was extreme and outrageous; (3) the defendant's actions were the proximate cause of the plaintiff's

---

[8] The SAC does not explicitly allege that a negative memorandum was placed in Dr. Goydos's employment file, only that it was "alleged that a memorandum had been placed into Dr. Goydos's employment file." (SAC ¶ 208.) The Court, therefore, will not consider this for the purpose of the CEPA adverse employment action analysis.

distress; and (4) the emotional distress suffered by the plaintiff was severe." *Jewett v. IDT Corp.*, No. 04-1454, 2005 WL 8154124, at *1 (D.N.J. Dec. 28, 2005) (citing *Buckley v. Trenton Sav. Fund Soc'y*, 111 N.J. 355, 366 (1988). Conduct is "extreme and outrageous" when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Subbe-Hirt v. Bacciagalupi*, 94 F.3d 111, 114 (3d Cir. 1996) (citation omitted).

Here, the Court finds that Plaintiffs fail to state a claim for intentional infliction of emotional distress. In particular, the Court finds that Plaintiffs do not plead that defendants' conduct was extreme and outrageous nor that Defendants' actions were the proximate cause of Dr. Goydos's distress. Defendants' investigation into the camera placed in the women's bathroom did not constitute extreme and outrageous conduct. The Court finds that the SAC does not indicate that Defendants acted unreasonably in attempting to find the perpetrator of that heinous conduct or by informing authorities of the results of that investigation. Nor does the SAC allege any other facts that rise to the level of "extreme and outrageous." *Subbe-Hirt*, 94 F.3d at 115 (citation omitted). This claim, therefore, must fail as a matter of law.

### D.    Conversion

Plaintiffs next allege that the Rutgers Defendants wrongfully interfered with Dr. Goydos's right to access and possess his personal belongings when they placed him on administrative leave. (SAC ¶ 358.) Plaintiffs specifically allege that Dr. Goydos was entitled to the possession of his laboratory equipment and supplies that he purchased with his own funds and laboratory equipment and supplies that were given to him. (*Id.*) In response, Defendants argue that (1) Plaintiffs have not demonstrated specific property that belongs to Dr. Goydos that was wrongfully interfered with by Defendants, and (2) Dr. Goydos was allowed to retrieve his personal belongings from his office on February 13, 2019. (Defs.' Moving Br. 32.)

"Under New Jersey law, '[c]onversion is essentially the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property.'" *Rickerson v. Pinnacle Foods Inc.*, No. 17-4469, 2018 WL 1704788, at *3 (D.N.J. Apr. 9, 2018) (quoting *Peloro v. United States*, 488 F.3d 163, 173–74 (3d Cir. 2007)). The elements of conversion are "(1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant." *City of Atl. City v. Zemurray St. Cap., LLC*, No. 14-5169, 2017 WL 6638203, at *17 (D.N.J. Dec. 29, 2017).

The Court finds that Plaintiffs fail to state a claim upon which relief may be granted. Plaintiffs adequately allege the existence of Dr. Goydos's property and right to access such property, but wholly fail to allege any facts indicating the Defendants' wrongful interference with his rights. Under New Jersey law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Barco Auto Leasing Corp. v. Holt*, 548 A.2d 1161, 1164-65 (N.J. Super. Ct. App. Div. 1988) (internal quotations omitted). The SAC does not allege any facts that Defendants took possession of Dr. Goydos's property to "exercise" the "right of ownership."[9] Thus, the Court finds that Plaintiffs fail to state a claim for relief on their conversion claim.

E.      **Breach of Contract**

As to the breach of contract claim, Plaintiffs allege that Dr. Goydos had a contract of employment with the Rutgers Defendants by virtue of his tenured status and applicable law and policies adopted by the Rutgers Defendants. (SAC ¶ 361.) Plaintiffs allege that under Rutgers Policy Section 60.5.13, a tenured employee "shall hold the office indefinitely at the pleasure of the

---

[9] Plaintiffs' opposition brief, in fact, highlights Defendants' exhibit in which they attempt to work with Dr. Goydos to retrieve the items he alleges belong to him. (*See* Bennett Certif., Ex. A, *137.)

Board of Governors." (*Id.* ¶ 362.) Plaintiffs allege that the Rutgers Defendants breached his employment contract by declaring that they would pursue de-tenuring proceedings, without the ratification or direction of the Board of Governors, and that this breach resulted in Dr. Goydos's constructive discharge. (*Id.* ¶¶ 363-64.) The Rutgers Defendants argue that Plaintiffs' contentions hinge on the argument that the notice of the de-tenuring proceedings was a violation of the Rutgers' policy at issue and that the policy constituted an employment contract between Rutgers and Dr. Goydos. (Defs.' Moving Br. 33.)

To state a breach of contract claim, a plaintiff must allege: (1) the existence of a contract between the parties, (2) a breach of that contract, (3) damages flowing from that contract, and (4) that the party bringing the breach of contract claim performed its own obligations under the contract. *See Frederico v. Home Depot*, 507 F.3d 188, 203-04 (3d Cir. 2007) (citation omitted). In New Jersey, for the purposes of a breach of contract claim, a "constructive discharge occurs when the employer has imposed upon an employee working conditions 'so intolerable that a reasonable person subject to them would resign.'" *Daniels v. Mutual Life Ins. Co.*, 773 A.2d 718, 721 (N.J. Super. Ct. App. Div. 2001). The Court finds that Plaintiffs fail to state a claim for relief because Plaintiffs do not adequately allege that the Rutgers Defendants breached the alleged contract or that Dr. Goydos sustained damages flowing from that contract. The SAC does not state a claim for constructive discharge on the basis that the Rutgers Defendants or Dr. Goydos's colleagues made intolerable working conditions. Because Plaintiffs fail to adequately plead that Dr. Goydos was

constructively discharged, the Court declines to address whether a contract existed or whether Defendants breached that contract by initiating de-tenuring proceedings.[10]

### F.   Per Quod

Finally, Plaintiffs allege a *per quod* claim on behalf of Dr. Goydos's wife, Plaintiff Martins, for "the loss or impairment of the comfort, economic support, companionship, consortium, services and duties previously provided by her husband." (SAC ¶ 367.) The Court finds that this claim fails as a matter of law. The viability of Plaintiff Martins's *per quod* claim is subject to the survival of the claims of Dr. Goydos. *Bachman v. United States*, No. 03-4897, 2006 WL 3761985, at *7 (D.N.J. Dec. 19, 2006) ("*Per quod* claims are 'only maintainable by reason of a spouse's injury.'" (citation omitted)).

Moreover, neither the Third Circuit nor New Jersey state courts have recognized per quod claims on Section 1983 claims.[11] *Livingston v. North Belle Vernon Borough*, 12 F.3d 1205, 1215 n.10 (3d Cir. 1993); *Maudsley v. State*, 816 A.2d 189, 208 (N.J. Super. Ct. App. Div. 2003). Here, because the only surviving claims of Dr. Goydos are Section 1983 claims, the *per quod* claim cannot survive Defendants' motion to dismiss.

---

[10] The parties also squabble about whether N.J. Stat. Ann. 2A:53A-18 serves as a complete bar to any of Plaintiffs' state law claims. (*See* Pls.' Opp'n Br. 28-29; Defs.' Moving Br. 23.) That statute provides that a person who "pleads guilty to a criminal offense, shall be barred from receiving a judgment. . . for civil actions relating to conduct that led to pleading." The Court is dubious of Plaintiffs' argument that the SAC's allegations "do not arise from conduct Dr. Goydos pleaded guilty to." (Pls.' Opp'n Br. 30.) Plaintiffs assert that "Dr. Goydos was never charged with wrongdoing stemming from. . . patient treatment and the State never claimed misconduct involving the practice of medicine." *Id.* The focus of the Defendants investigation, however, was workplace misconduct, not medical malpractice. Indeed, Dr. Goydos ended up pleading guilty to burglary, computer theft and impersonation stemming from actions uncovered during that investigation. (Bennett Certif., Ex. I) Because the Court dismisses the state law claims on other grounds, however, it declines to explicitly rule that the statute bars the state law claims.

[11] Other Circuits have explicitly held in the alternative. *See Niehus v. Liberio*, 973 F.2d 526, 532 (7th Cir.1992); *Berry v. City of Muskogee*, 900 F.2d 1489, 1506–07 (10th Cir. 1990); *Stallworth v. City of Cleveland*, 893 F.2d 830, 838 (6th Cir. 1990).

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss is granted in part and denied in part. The Court will enter an Order consistent with this Memorandum Opinion.

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE