**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES S. GOYDOS & MARIA E. MARTINS,<br><br>Plaintiffs,<br><br>v.<br><br>RUTGERS, THE STATE UNIVERSITY et al.,<br><br>Defendants. | Civil Action No. 19-8966 (RK) (JTQ)<br><br>**OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon cross-motions for summary judgment filed by Defendant Rutgers, the State University of New Jersey ("Defendant" or "Rutgers") ("Def. MSJ," ECF No. 194-3) and Plaintiffs Dr. James S. Goydos ("Dr. Goydos") and Dr. Maria E. Martins ("Dr. Martins") (collectively, "Plaintiffs") ("Pls. MSJ," ECF No. 196-2). The parties opposed each other's motions ("Pls. Opp.," ECF No. 202; "Def. Opp.," ECF No. 201) and replied ("Pls. Reply," ECF No. 207; "Def. Reply," ECF No. 206). The parties also submitted statements of material facts in support of their respective motions ("Def. SUMF," ECF No. 194-2; "Pls. SUMF," ECF No. 196-1) and responses thereto ("Resp. to Def. SUMF," ECF No. 202-1 ¶¶ 1–89; "Resp. to Pls. SUMF," ECF No. 201-1). Defendant submitted a reply to Plaintiffs' responsive statement. ("Def. Reply SUMF," ECF No. 206-1.) Plaintiffs also submitted an additional statement of undisputed material facts to which Defendant responded. ("Pls. ASUMF," ECF No. 202-1 ¶¶ 90–101; "Resp. to Pls. ASUMF," ECF No. 206-2.) The Court has considered the parties' submissions and resolves the pending motions without oral argument pursuant to Federal Rule of

Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Plaintiffs' motion

is **DENIED** and Defendant's motion is **GRANTED**.

## I.    BACKGROUND

"Freedom of access to the courts is a cherished value in our democratic society." *Talamini*

*v. Allstate Ins. Co.*, 470 U.S. 1067, 1070 (1985) (Stevens, J., concurring). As has long been

observed, "the very object for which civil courts have been established . . . is to secure the peace

and repose of society by the settlement of matters capable of judicial determination." *S. Pac. R.*

*Co. v. United States*, 168 U.S. 1, 27 (1897). "There is, and should be, the strongest presumption of

open access to all levels of the judicial system." *Talamini*, 470 U.S. at 1072 (Stevens, J.,

concurring). "This is not, of course, to suggest that courts should tolerate gross abuses of the

judicial process." *Id.* Litigants and lawyers alike must, among other things, "[s]top" and "[t]hink"

before bringing a lawsuit. *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir. 1987). This case is

an example of what can happen when that type of critical, or in this case, even rudimentary

reflection is absent.

The facts of this case strain the bounds of decency and demonstrate the dark depths one

may go to with heartless abandon to exact revenge for some perceived grievance. At the time of

the events at issue, Dr. Goydos himself was an accomplished cancer researcher and Professor in

the Department of Surgery at Rutgers Robert Wood Johnson Medical School and Chief of the

Section of Melanoma and Soft Tissue Oncology at the Rutgers Cancer Institute of New Jersey

("RCINJ").[1] (Def. SUMF ¶ 1; Resp. to Def. SUMF ¶ 1.) Dr. Steven K. Libutti ("Dr. Libutti") was

the newly appointed Director of RCINJ. (Def. SUMF ¶ 7; Resp. to Def. SUMF ¶ 7.) Dr. Libutti is

---

[1] As discussed later, for reasons which will become apparent, as part of his guilty plea, Dr. Goydos surrendered his license to practice medicine. (Def. SUMF ¶ 87; Resp. to Def. SUMF ¶ 87; ECF No. 194-5, Ex. 49, Interim Consent Order.)

a Harvard and Columbia educated "internationally known expert in the management of neuroendocrine tumors." *See* Steven K. Libutti, MD, FACS, *Rutgers Cancer Inst.*, https://cinj.org/about-cinj/steven-k-libutti-md-facs.[2] RCINJ hired Dr. Libutti "to help lead the transformation of Rutgers into a national leader in cancer care." (ECF No. 197, Ex. 10, Letter from Brian L. Strom to Dr. Libutti at 2.)[3] Dr. Goydos disagreed with what he perceived as Dr. Libutti's approach of "splitting the clinical and research components [of RCINJ] into separate . . . silos." (Def. SUMF ¶ 7 (quoting ECF No. 194-5, Ex. 2, Goydos Dep. Tr. at 64:5–7); Resp. to Def. SUMF ¶ 7.) Partially due to this disagreement, Dr. Goydos sought to leave RCINJ for another renowned cancer research facility. (Def. SUMF ¶¶ 6–8; Resp. to Def. SUMF ¶¶ 6–8.) If only it ended there.

A.    AN ANONYMOUS TIP REPORTS A HIDDEN CAMERA AT RCINJ

On the afternoon of Tuesday, September 19, 2017, an anonymous tip was made to "Crime

---

[2] The Court takes judicial notice of Dr. Libutti's biography on RCINJ's website. *See ARCHforensic, LLC v. Arch Eng'g, LLC*, No. 21-16022, 2023 WL 2662584, at *6 n.4 (D.N.J. Mar. 28, 2023) ("The Court takes judicial notice of [the] online biography . . . ."); *see also Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017) ("To the extent that we rely on information beyond what the government included in its amicus brief, that information is publicly available on government websites and therefore we take judicial notice of it.").

[3] The Court has reviewed and makes reference to a few sealed documents cited or quoted by the parties. (*See* Def. SUMF ¶ 10 (citing ECF No. 195, Ex. 8, September 19, 2017 Tip Submitted to Crime Stoppers of Middlesex County); *id.* ¶ 12 (citing ECF No. 195, Ex. 10, Documents Regarding Rutgers' Receipt of Anonymous Complaint); *id.* ¶ 60 (quoting ECF No. 195, Ex. 36, September 20 to 22, 2018 Email Exchange); Pls. MSJ at 21 n.19 (citing ECF No. 197, Ex. 10, Letter from Brian L. Strom to Dr. Libutti).) The Court will not place this Opinion under seal because the Court's brief references and allusions to these documents do not implicate any confidentiality concerns. *See, e.g., Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1289 n.1 (3d Cir. 1996) ("We also note that in the course of our opinion we make reference to a sealed appendix. This appendix was sealed because it contained certain sensitive commercial materials, but the items to which we refer are not of that character."); *Shaporov v. Levine*, No. 22-1150, 2025 WL 2731460, at *4 n.9 (D.N.J. Sept. 25, 2025) ("[B]ecause the parties have not filed under seal their briefs revealing much of the content of the sealed exhibits, the Court will not seal this Opinion."); *Romah v. Scully*, No. 06-698, 2007 WL 3493943, at *5 n.15 (W.D. Pa. Nov. 13, 2007) ("Because the evidence submitted by Plaintiff was filed under seal, the Court will only generally refer to said documents."); *Bullion Monarch Mining, Inc. v. Barrick Goldstrike Mines, Inc.*, No. 09-612, 2016 WL 8735620, at *1 n.1 (D. Nev. Sept. 30, 2016) ("The Court will . . . reference information in sealed documents in general terms to avoid sealing this Order."); *United States v. Gourevitch*, No. 12-CR-758, 2014 WL 4724701, at *3 n.2 (E.D.N.Y. Sept. 23, 2014) ("In this opinion, the court will refer only in general terms to information contained in the sealed filings.").

3

Stoppers of Middlesex County." (Def. SUMF ¶ 10; Resp. to Def. SUMF ¶ 10.) The tipster, purportedly a woman who was panicked and in fear, reported that there was a small hole in the ceiling, and potentially a camera, over a stall in the second-floor women's bathroom at RCINJ. (Def. SUMF ¶ 10; Resp. to Def. SUMF ¶ 10; ECF No. 195, Ex. 8, September 19, 2017 Tip Submitted to Crime Stoppers of Middlesex County.) An image of the suspected camera was attached to the tip, and the tip further indicated that the tipster had twice seen Dr. Libutti exiting that women's bathroom. (ECF No. 195, Ex. 8, September 19, 2017 Tip Submitted to Crime Stoppers of Middlesex County.) As Dr. Libutti was the only person named or referenced in the tip, and that the tipster saw him recently exiting that women's bathroom more than once, this tip clearly suggested that he was a possible perpetrator.

Both the Middlesex County Prosecutor's Office ("MCPO") and Rutgers University Police Department ("RUPD") immediately began investigating the tip. (Def. SUMF ¶¶ 13–14; Resp. to Def. SUMF ¶¶ 13–14.) In the women's bathroom, RUPD officers discovered "a small hole approximately the size of a penny carved into a ceiling tile." (Def. SUMF ¶ 14; Resp. to Def. SUMF ¶ 14.) After removing the ceiling tile, officers discovered wiring leading toward the Director's Suite. (Def. SUMF ¶¶ 15–16; Resp. to Def. SUMF ¶¶ 15–16.)

The next day, RUPD officers returned to the scene and discovered a device near the hole. (Def. SUMF ¶ 17; Resp. to Def. SUMF ¶ 17.) That evening, Rutgers received an anonymous call stating that the caller's coworker was "hysterical" because she thought Dr. Libutti hid a camera in the bathroom and noting that the coworker previously submitted an anonymous tip through middlesextips.com. (Def. SUMF ¶ 18: Resp. to Def. SUMF ¶ 18; ECF No. 195, Ex. 10, Documents Regarding Rutgers' Receipt of Anonymous Complaint.) That same night, officers determined that the earlier-discovered device was, in fact, a camera that was connected to a digital video recorder.

(Def. SUMF ¶¶ 19–20; Resp. to Def. SUMF ¶¶ 19–20.) The officers followed the wires, which led into Dr. Libutti's office. (Def. SUMF ¶ 21; Resp. to Def. SUMF ¶ 21.)

### B.    Mr. Vartan Conducts His Investigation

The next day, September 21—in light of the anonymous tipster identifying him as the possible culprit, the confirmation of the camera, and the highly concerning wiring leading to his personal office—officers interviewed Dr. Libutti, who denied any involvement with the camera. (Def. SUMF ¶ 22; Resp. to Def. SUMF ¶ 22.) Dr. Libutti retained Lee Vartan, Esq. ("Mr. Vartan") as his legal counsel, and Mr. Vartan in turn retained Secure Investigations, an outside firm, to investigate the incident. (Def. SUMF ¶¶ 23–24; Resp. to Def. SUMF ¶¶ 23–24; ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 6:23–7:7.) Given Dr. Libutti's position, Mr. Vartan understandably was concerned that "a charge . . . would be incredibly injurious" to Dr. Libutti. (ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 16:21–23.)

As part of the investigation, Mr. Vartan, Secure Investigations, or both interviewed Rutgers employees and obtained records showing Dr. Libutti's location at relevant times. (Def. SUMF ¶ 25; Resp. to Def. SUMF ¶ 25.) Through this investigation, Mr. Vartan learned that on Monday, September 18, 2017—the day before the anonymous tip—multiple witnesses found dust from the ceiling tiles on their desks in the Director's Suite that was not there when they left on Friday, September 15, 2017, indicating that something jostled the ceiling tiles over the weekend; Dr. Libutti was out of the country that weekend; Dr. Goydos knew Dr. Libutti would be out of the country that weekend; and Dr. Goydos had previously been reported for unauthorized entry into the Director's office. (Def. SUMF ¶ 27; Resp. to Def. SUMF ¶ 27.) Mr. Vartan obtained Dr. Goydos's "swipe records" from a parking garage that allowed access to Robert Wood Johnson University Hospital and RCINJ. (Def. SUMF ¶ 28; Resp. to Def. SUMF ¶ 28.) These records revealed that Dr. Goydos was present at RCINJ for much of the day on Saturday, September 16,

2017 and Sunday, September 17, 2017. (Def. SUMF ¶ 28; Resp. to Def. SUMF ¶ 28.) Records further indicated that Dr. Goydos had swiped into the building each of the ten times between September 1 and September 17, 2017 where the door to the Director's Suite was recorded by security systems as having been "forced open." (ECF No. 194-5, Ex. 26, Warrant Affidavit at 10, 13 (indicating that the door openings were recorded as "forced");[4] Def. SUMF ¶ 28; Resp. to Def. SUMF ¶ 28.) Mr. Vartan also examined the contents of Dr. Libutti's computer and phone and found nothing incriminating. (Def. SUMF ¶ 28; Resp. to Def. SUMF ¶ 28.)

Most relevant here, Rutgers personnel imaged (i.e., copied) Dr. Goydos's Rutgers-owned work computer in October 2017 at the direction of either Dr. Libutti (according to Plaintiffs) or Mr. Vartan (according to Defendant). (Def. SUMF ¶¶ 29–30; Resp. to Def. SUMF ¶¶ 29–30.) This was done without authorization from Rutgers Office of General Counsel ("OGC"). (Pls. SUMF ¶ 9; Resp. to Pls. SUMF ¶ 9.) This request was communicated through various Rutgers employees. (Def. SUMF ¶¶ 30–32; Resp. to Def. SUMF ¶¶ 30–32.) Ultimately, Adrian Rodriguez ("Mr. Rodriguez"), Director of Information Systems and Technology for Rutgers, asked Barry Shandalow ("Mr. Shandalow"), an RCINJ technical support employee, to take the image. (Def. SUMF ¶¶ 31–32; Resp. to Def. SUMF ¶¶ 31–32.) Mr. Shandalow took the image late October 2, 2017 or early October 3, 2017 (the "October Imaging"). (Def. SUMF ¶ 35; Resp. to Def. SUMF ¶ 35; Pls. SUMF ¶ 6; Resp. to Pls. SUMF ¶ 6.)

Mr. Vartan testified that the image of the computer contained pictures of the camera and associated wiring as well as internet search history that made it clear that Dr. Goydos, rather than Dr. Libutti, had installed the camera. (ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 18:1–9; Def.

---

[4] Based on the record and the parties' failure to sufficiently define the significance of these "forced openings," the Court does not place much if any weight on this fact.

SUMF ¶ 42; Resp. to Def. SUMF ¶ 42.) Mr. Vartan did not share information about the imaging or the results of the imaging with Rutgers OGC or MCPO.[5] (Def. SUMF ¶ 36; ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 18:9–18 ("I knew [the results of the October Imaging] when I met with [the MCPO] team but I didn't tell them that. All I shared with them was the fact that we knew when this had happened based upon the ceiling dust. We shared swipe records if I recall into and out of the garage. We shared interview reports but I didn't go any further because I did not want to harm their investigation . . . ."); ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 24:24–25 ("[MCPO] was never told that I imaged the computer . . . ."); ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 26:17–25 (noting that the results of the October Imaging were not shared with Rutgers, MCPO, or Rutgers police); ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 35:1 ("I shared nothing with Rutgers.").)

On October 8 or 9, 2017, Rutgers Ethics and Compliance or OGC "instructed Mr. Rodriguez to cease any internal investigation activity." (Pls. SUMF ¶ 11; Resp. to Pls. SUMF ¶ 11; ECF No. 196-4, Ex. 2, Evid. Hr'g Tr. at 82:2–23.) Mr. Rodriguez then ceased the investigation and wiped his copy of the image. (Pls. SUMF ¶ 12; Resp. to Pls. SUMF ¶ 12.) There is no evidence adduced that the October Imaging done at the behest of Dr. Libutti or Mr. Vartan was ever provided to, viewed by, or otherwise used by Rutgers or MCPO as it relates to this incident or any aspect of the investigations they both conducted. In fact, Mr. Vartan testified that he ordered the October Imaging solely as part of his individual representation of Dr. Libutti to gather facts to attempt to determine who the true culprit was. (*See* ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 24:14–16 ("I

---

[5] Plaintiffs contest whether "this is a proven fact," but they offer no evidence to contradict it. (Resp. to Def. SUMF ¶ 36.) Defendant having supported its assertion with evidence, Plaintiffs' denial is insufficient to create a genuine dispute of material fact. *See Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact."); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 ("[W]here the non-moving party's *evidence* contradicts the movant's, then the non-movant's must be taken as true." (emphasis added)).

represented Dr. Libutti. My sole concern was Dr. Libutti and I presume had I consulted with Rutgers they would have said [not to conduct the October Imaging].”). This appears corroborated by the fact that the search warrant affidavit ultimately submitted in support of a request for warrants to search Dr. Goydos's home and RCINJ office contained ample references to the imaging later conducted by Rutgers, but none to the October Imaging. (*See* ECF No. 194-5, Ex. 26, Warrant Affidavit at 11–14.)

## C.    RUTGERS AND MCPO CONDUCT THEIR OWN INVESTIGATIONS

Rutgers OGC retained outside counsel to conduct its own investigation. (Def. SUMF ¶ 37; Resp. to Def. SUMF ¶ 37.) As part of this investigation, another image was taken of Dr. Goydos's computer in November of 2017 (the "November Imaging"). (*See* Def. SUMF ¶ 38; Resp. to Def. SUMF ¶ 38; Pls. SUMF ¶ 13; Resp. to Pls. SUMF ¶ 13.)

As part of Rutgers' investigation, William Maderer, Esq. ("Mr. Maderer"), counsel for Rutgers, sent an email to Shaun I. Blick, Esq. ("Mr. Blick"), counsel for Dr. Goydos, requesting an interview with Dr. Goydos. (Def. SUMF ¶ 43; Resp. to Def. SUMF ¶ 43.) Mr. Blick objected to the request and instead offered to have Dr. Goydos answer written questions. (Def. SUMF ¶¶ 44–45; Resp. to Def. SUMF ¶¶ 44–45.) On March 23, 2018, Mr. Maderer conducted a teleconference with Mr. Blick and again requested to interview Dr. Goydos. (Def. SUMF ¶ 46; Resp. to Def. SUMF ¶ 46.) Mr. Maderer explained that if Dr. Goydos declined, he "may next be directed by his supervisor to appear for the purpose of answering questions" and that if he did not cooperate then, "he may be subject to disciplinary proceedings and disciplinary action." (ECF No. 202-3, Ex. R-3, February 15 to March 23, 2018 Email Exchange at D-218 (email memorializing call); *see* ECF No. 202-3, Ex. R-8, Maderer Dep. Tr. at 55:15–16 (confirming accuracy of memorialization); Resp. to Def. SUMF ¶ 91; Def. Reply SUMF ¶ 91.) Mr. Blick then reiterated Dr. Goydos's refusal to be interviewed and reaffirmed Dr. Goydos's willingness to answer written

questions (Def. SUMF ¶ 47; Resp. to Def. SUMF ¶ 47.) Counsel for Rutgers did not make any further attempts to interview Dr. Goydos, and Dr. Goydos did not make any statement, answer any questions, or sit for an interview. (Def. SUMF ¶ 48; Resp. to Def. SUMF ¶ 48.)

On March 29, 2018, as part of MCPO's investigation into the camera incident, an MCPO detective submitted an affidavit in support of an application for search warrants to search Dr. Goydos's home and office. (Def. SUMF ¶ 50; Resp. to Def. SUMF ¶ 50.) Among other things, the affidavit summarized the results of the November Imaging. (*See* ECF No. 194-5, Ex. 26, Warrant Affidavit at 11–14.) It noted that Dr. Goydos's computer had been used to access middlesextips.com the same day the initial tip naming Dr. Libutti was submitted, the computer contained the same photograph of the camera that was attached to the tip, the computer contained files with sexually explicit or suggestive file names, the computer had been used to search for surveillance laws, the computer contained photos that seemed to have been covertly taken of various RCINJ offices, and the computer contained various files and folders pertaining to Dr. Libutti. (*Id.* at 11–13.)

On March 29, 2018, law enforcement obtained a Superior Court Judge's authority to execute search warrants of Dr. Goydos's home and RCINJ office. (*See* ECF No. 194-5, Ex. 28, Warrant to Search Dr. Goydos's Residence; ECF No. 194-5, Ex. 32, Warrant to Search Dr. Goydos's Office.) On March 30, 2018, Dr. Goydos's home and RCINJ office were searched pursuant to the warrants. (Def. SUMF ¶¶ 51–55; Resp. to Def. SUMF ¶¶ 51–55.) At Dr. Goydos's home, officers seized an assault rifle and various incriminating items including documents with Dr. Libutti's personal information and account usernames and passwords, lock picking tools, various covert and mini cameras, and three books titled "Wiring Simplified," "Practical Lockpicking," and "Getting Even." (Def. SUMF ¶¶ 52–53; Resp. to Def. SUMF ¶¶ 52–53.) At Dr.

9

Goydos's RCINJ office, officers seized a computer and "covert camera." (Def. SUMF ¶ 55; Resp. to Def. SUMF ¶ 55.)

The same day, March 30, 2018, Dr. Goydos was arrested for unlawful possession of the assault rifle. (Def. SUMF ¶ 56; Resp. to Def. SUMF ¶ 56.) While he was handcuffed to a bench in the New Brunswick Police Department, two individuals identifying themselves as Rutgers police officers gave Dr. Goydos a letter placing him on paid administrative leave. (ECF No. 194-5, Ex. 2, Goydos Dep. Tr. at 178:5–18; *see* Def. SUMF ¶ 57; Resp. to Def. SUMF ¶ 57.)

### D.    DR. GOYDOS CONTESTS RUTGERS' POSSESSION OF CERTAIN PROPERTY

Post arrest, from July through September of 2018, Mr. Blick—Dr. Goydos's counsel—and Rutgers OGC exchanged a series of emails concerning whether certain laboratory and personal items were owned by Rutgers or Dr. Goydos. (Def. SUMF ¶¶ 58–60; Resp. to Def. SUMF ¶¶ 58–60.) Ultimately, OGC agreed that "if it is established that Dr. Goydos is the proper owner of any of these items, the University will make them available for pickup at Dr. Goydos' expense." (Def. SUMF ¶ 60 (emphasis omitted) (quoting ECF No. 195, Ex. 36, September 20 to 22, 2018 Email Exchange at D-277); Resp. to Def. SUMF ¶ 60.)

Several months later, Mr. Blick and OGC engaged in another email exchange. (Def. SUMF ¶¶ 63–69; Resp. to Def. SUMF ¶¶ 63–69.) Despite the fact that Dr. Goydos was banned from visiting campus, "as a professional courtesy," OGC allowed him to return to RCINJ to retrieve his personal belongings. (Def. SUMF ¶¶ 66, 68–69; Resp. to Def. SUMF ¶¶ 66, 68–69.) It was further established that if Dr. Goydos and Rutgers disagreed about the ownership of any items, they would be stored until ownership could be resolved via documentation. (Def. SUMF ¶¶ 68–69; Resp. to Def. SUMF ¶¶ 68–69.) On February 13, 2019, Dr. Goydos visited RCINJ and retrieved various personal belongings. (Def. SUMF ¶ 70; Resp. to Def. SUMF ¶ 70.) The next day, Mr. Blick sent an email to OGC stating that several items allegedly belonging to Dr. Goydos were missing during

10

the visit. (Def. SUMF ¶ 71; Resp. to Def. SUMF ¶ 71.) Another email exchange ensued. Mr. Blick identified the items at issue, ranging from small items such as erasers worth a few dollars to scanners and printers worth hundreds, and OGC reiterated its request for documentation. (Def. SUMF ¶¶ 72–76; Resp. to Def. SUMF ¶¶ 72–76; ECF No. 194-5, Ex. 41, February 20 to 21, 2019 Email Exchange.) Then or to date, neither Mr. Blick nor Dr. Goydos provided the requested documentation establishing Dr. Goydos's ownership of the items he claimed were his, or proof of the existence of any of the items he claimed were missing—let alone any proof of his ownership of the supposedly missing items. (Def. SUMF ¶ 77; Resp. to Def. SUMF ¶ 77.)

E.    DR. GOYDOS IS INDICTED, PLEADS GUILTY, AND IS SENTENCED

After learning that he was likely to face additional charges for his involvement in the illicit camera framing incident, on December 14, 2018, Dr. Goydos resigned from his employment with Rutgers. (Def. SUMF ¶ 61; Resp. to Def. SUMF ¶ 61.) Two weeks later, Dr. Goydos was indicted in New Jersey Superior Court for 160 counts of criminal conduct, including weapons-related charges, burglary, official misconduct, and impersonation, among others. (Def. SUMF ¶ 62; Resp. to Def. SUMF ¶ 62.)

On December 19, 2019, Dr. Goydos pleaded guilty to one count each of burglary, impersonation, official misconduct, and possession of an assault weapon and two counts of computer theft. (Def. SUMF ¶ 78; Resp. to Def. SUMF ¶ 78.) In his plea allocution, Dr. Goydos admitted the following: with respect to the burglary count, that he entered the Director's Suite without authorization and accessed Dr. Libutti's personal information on Dr. Libutti's computer, (Def. SUMF ¶ 79; Resp. to Def. SUMF ¶ 79; ECF No. 194-5, Ex. 44, Plea Hr'g Tr. at 17:10–19:5); with respect to the first count of computer theft, that he accessed information from the computer of Dr. Libutti's assistant without permission and to use for his own purposes, (Def. SUMF ¶ 80; Resp. to Def. SUMF ¶ 80; ECF No. 194-5, Ex. 44, Plea Hr'g Tr. at 19:6–20:14); with respect to

11

the second count of computer theft, that he accessed information—including Dr. Libutti's personal information from a computer located in the Director's suite—without permission and for his own purposes, (Def. SUMF ¶ 81; Resp. to Def. SUMF ¶ 81; ECF No. 194-5, Ex. 44, Plea Hr'g Tr. at 20:15–21:17); with respect to the impersonation count, that he utilized the log-in credentials of another person without consent to access the personal information of Dr. Libutti to benefit himself, (Def. SUMF ¶ 83; Resp. to Def. SUMF ¶ 83; ECF No. 194-5, Ex. 44, Plea Hr'g Tr. at 21:18–23:19); and with respect to the official misconduct count, that it was through his position at Rutgers that he was able to access the RCINJ building and Director's Suite, (ECF No. 194-5, Ex. 44, Plea Hr'g Tr. at 23:20–24:25). As part of his guilty plea, the remaining 154 counts were dismissed. (Def. SUMF ¶ 84; Resp. to Def. SUMF ¶ 84.) Dr. Goydos was sentenced to 300 days' incarceration and four years' probation. (Def. SUMF ¶ 85; Resp. to Def. SUMF ¶ 85.)

Dr. Goydos appealed his sentence which was affirmed by the Appellate Division. *State v. Goydos*, No. A-4504-19, 2022 WL 211123 (N.J. Super. Ct. App. Div. Jan. 25, 2022) (per curiam). Dr. Goydos also filed a petition for post-conviction relief. The petition was denied by the Superior Court, and the Appellate Division affirmed. *See State v. Goydos*, No. A-2015-23, 2025 WL 2779034 (N.J. Super. Ct. App. Div. Sept. 30, 2025) (per curiam). Dr. Goydos ultimately was incarcerated for 110 days, forfeited any right to current and future public employment, and agreed to cease practicing medicine in New Jersey. (Def. SUMF ¶¶ 86–88; Resp. to Def. SUMF ¶¶ 86–88.)

\*    \*    \*

Although the Court need not find the following as a matter of uncontested fact for purposes of resolving the cross-motions and is not doing so, the clear implication of the facts as recited above is as follows: The tipster, it turns out, was not some innocent anonymous woman who, at a compromised moment, happened to look up from a bathroom stall, horrified at the prospect of being surreptitiously viewed and/or recorded in one's most private, personal of moments. Rather, the extensive premeditation and execution of this sinister plot to frame Dr. Libutti, a renowned physician, was apparently done by the hand of his colleague and fellow cancer researcher: Dr Goydos. No villain here, Dr. Libutti was a victim. He, along with Rutgers, was smeared with the terrible stain of this false accusation, at least until MCPO's criminal investigation—culminating in Dr. Goydos's guilty pleas to multiple felonies.

F.    **PROCEDURAL HISTORY**

On March 27, 2019, Plaintiffs initiated this action by filing a ten-count complaint against Rutgers and other defendants alleging violations of the Constitution of the United States, various New Jersey statutes, and New Jersey common law. (ECF No. 1.) In the seven years since, six United States district judges and multiple magistrate judges have presided over this case.

After many filings not relevant here, Defendants moved to dismiss Plaintiffs' Second Amended Complaint, and the Honorable Michael A. Shipp, U.S.D.J., granted the motion in part and denied it in part. (ECF Nos. 71, 76–77.) Thereafter, Plaintiffs filed their Third Amended Complaint, which is the operative complaint. ("TAC," ECF No. 82.) Again, Defendants moved to dismiss, and again, the Court—this time, the Honorable Georgette Castner, U.S.D.J.—granted the motion in part and denied it in part. (ECF Nos. 87, 102–03.) After Judge Castner dismissed some of Defendant's previously filed counterclaims, Defendant filed an amended answer and counterclaims. (ECF Nos. 134–35, 139.) Plaintiffs then answered the counterclaims. (ECF No.

13

141.) On June 14, 2024, this case was reassigned from Judge Castner to the Undersigned—the sixth district judge to be assigned this action. (ECF No. 145; *see also* ECF Nos. 32, 74, 75, 94.)

After Judge Castner's order partially granting Defendants' motion to dismiss the TAC—the still operative complaint—only four claims remain: Count Two, a Fourth Amendment claim brought under 42 U.S.C. § 1983; Count Three, a Fifth Amendment claim brought under 42 U.S.C. § 1983; Count Eight, a conversion claim under New Jersey common law; and Count Ten, a *per quod* claim under New Jersey common law. (ECF Nos. 102–03.) Rutgers is the only remaining defendant.[6] The parties have cross moved for summary judgment. (*See* Pls. MSJ; Def. MSJ.) Defendant moves for summary judgment on all remaining counts, while Plaintiffs only move for summary judgment on the Fourth Amendment claim. (*See* Pls. MSJ at 5; Def. MSJ at 1.) The motions are fully briefed and ripe for adjudication.

---

[6] Rutgers and RCINJ are named separately in the TAC. (*See, e.g.*, TAC ¶¶ 4–5.) However, as Defendant explains, RCINJ "is part of Rutgers" and Rutgers is "the only remaining Defendant in this action." (Def. SUMF at 1); *see also Murray v. Rutgers Cancer Inst. of N.J.*, No. A-3347-23, 2025 WL 915540, at *2 & n.2 (N.J. Super. Ct. App. Div. Mar. 26, 2025) (per curiam) (noting that Rutgers was "[i]mproperly pled as" RCINJ). Plaintiffs do not in any way contest this. Accordingly, "Defendant" and "Rutgers" refer to both RCINJ and Rutgers.

The Fifth Amendment and conversion claims only name Rutgers and RCINJ as defendants. (TAC ¶¶ 326–43, 421–28.) The Fourth Amendment claim names Rutgers, RCINJ, and three individual defendants, but the three individual defendants were dismissed by Judge Castner. (*Id.* ¶¶ 281–325; ECF No. 103.) The *per quod* claim is "against all Defendants." (TAC ¶¶ 441–450.) However, a *per quod* claim is a derivative claim that is only maintainable against defendants against whom a plaintiff has an underlying claim. *See Archie v. County of Cumberland*, No. 21-18334, 2023 WL 2554158, at *5 (D.N.J. Mar. 17, 2023) ("As the Court finds that Plaintiff Shawn Archie has not stated an underlying claim against Defendant Salem County, it follows that Plaintiff Tara Archie has not stated a per quod claim against Defendant Salem County."); *see also Weir v. Mkt. Transition Facility of N.J.*, 723 A.2d 1231, 1235–36 (N.J. Super. Ct. App. Div. 1999) ("A *per quod* claim is only maintainable by reason of a spouse's personal injury. It depends upon and is incidental to the personal injury action. Our courts have characterized it as a derivative claim, not a separate cause of action. Such claims must be joined with the primary claim in a single action. The derivative claim can rise no higher than the personal injury claim of the other spouse." (quoting *Tichenor v. Santillo*, 527 A.2d 78, 82 (N.J. Super. Ct. App. Div. 1987))).

14

## II.    <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Put another way, "[s]ummary judgment is designed . . . to assess whether a genuine issue of material fact exists and whether a trial is necessary." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the party seeking summary judgment carries its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. "[A] plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint," *Orsatti*, 71 F.3d at 484 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)), and a court's duty to view all facts and inferences in the light most favorable to the nonmoving party does not extend to "the mere allegations or denials of his pleadings" unsupported by factual evidence, *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268 (3d Cir. 2014)). "Nor will '[b]are assertions, conclusory allegations, or suspicions' suffice." *Id.* (alteration in original) (quoting *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018)); *see also Jackson v. Danberg*, 594 F.3d 210, 228 (3d Cir. 2010) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (internal quotation marks omitted)). Likewise, the movant may establish entitlement to judgment as a matter of law by showing that the plaintiff's evidence is insufficient to establish an essential element of his claim.

This showing "necessarily renders all other facts immaterial," such that "there can be no genuine issue as to any material fact" for a jury to decide. *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

## III.    DISCUSSION

### A.    THE FOURTH AMENDMENT CLAIM

As discussed below, the Court **GRANTS** summary judgment in Rutgers's favor on the Fourth Amendment claim for two independently sufficient reasons. *First*, Plaintiffs cannot show that Rutgers is liable for any constitutional violation stemming from the October Imaging. *Second*, even Rutgers could be liable, the October Imaging was constitutional.

#### 1.    Liability Under *Monell*

Plaintiffs argue that the October Imaging violated Dr. Goydos's Fourth Amendment right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV; (TAC ¶¶ 288, 318; Pls. MSJ at 11–16.) As they must, *see infra* note 8, Plaintiffs proceed under a *Monell* theory of liability against Rutgers. (*See* TAC ¶ 323 (describing Rutgers's actions as "carried out through its employees, agents, and officials" and pursuant to "policies, practices, and customs"); Pls. MSJ at 19–23); *see generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Under *Monell*, Rutgers may be liable for a plaintiff's injuries where those injuries were caused by either "an unconstitutional policy or custom" of Rutgers or Rutgers's "failure or inadequacy" to train its employees "that 'reflects a deliberate or conscious choice.'" *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quoting *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).

Plaintiffs focus entirely on alleging a policy; specifically, they allege a policy based on Dr. Libutti's "single decision" to order the October Imaging.[7] (Pls. MSJ at 21; *see id.* 19–23.) A policy

---

[7] As a reminder, the parties dispute whether the October Imaging was ordered by Dr. Libutti or Mr. Vartan. (Def. SUMF ¶¶ 29–30; Resp. to Def. SUMF ¶¶ 29–30.) Because the Court grants Defendant's motion for

may be based on "a single decision by municipal[8] policymakers under appropriate circumstances," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). However, "a plaintiff presenting an unconstitutional policy must point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject." *Forrest*, 930 F.3d at 105. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official— even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481–82 (plurality opinion)[9] (footnote omitted). Final authority matters because "*Monell* is a case about responsibility." *Id.* at 478 (majority opinion). Entities are liable "for their *own* illegal acts," not simply the acts of their employees under a theory of *respondeat*

---

summary judgment, it views the evidence in the light most favorable to Plaintiffs and assumes that the October Imaging was ordered by Dr. Libutti, as Plaintiffs claim. *See Graham v. Hathaway Lodge, Inc.*, No. 14-3420, 2015 WL 8490934, at *3 (D.N.J. Dec. 9, 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); (Resp. to Def. SUMF ¶ 29.)

 For purposes of Plaintiffs' motion, the Court, of course, views the evidence in the light most favorable to Defendant, meaning that it considers Mr. Vartan to have ordered the October Imaging. Plaintiffs make no argument that Mr. Vartan could have established Rutgers policy for *Monell* purposes. (*See* Pls. MSJ at 19–23.) This provides an independently sufficient reason to deny Plaintiffs' motion.

[8] *Monell* concerned whether liability under Section 1983 could be imposed on municipal actors, and much of *Monell*'s progeny speaks in terms of municipalities. However, *Monell* is frequently applied to many types of sub-state governmental entities including certain state universities, and Rutgers in particular. *See Conlon v. Rutgers*, No. 18-15770, 2021 WL 2905744, at *12 n.30 (D.N.J. Mar. 26, 2021); *Kovats v. Rutgers*, 633 F. Supp. 1469, 1476 (D.N.J. 1986) ("In *Monell* . . . , the Supreme Court held that municipalities and other local governmental units are 'persons' to whom § 1983 applies. There does not appear to be an analytical difference between universities and other governing bodies."), *aff'd*, 822 F.2d 1303 (3d Cir. 1987). For ease of readability, the Court will not alter the quoted references to municipalities.

[9] While this statement from *Pembaur* only garnered four votes, it constitutes established law in the Third Circuit and beyond. *See, e.g., Bennis v. Gable*, 823 F.2d 723, 733 n.11 (3d Cir. 1987); *Harrold v. City of Jersey City*, No. 19-9566, 2020 WL 1444923, at *4 (D.N.J. Mar. 24, 2020); *Moldowan v. City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009); *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). Moreover, it is a useful statement of the outer bound of *Monell* liability, as Justice O'Connor withheld her vote due to fears that this section could be "misread to expose municipalities to liability beyond that envisioned by the Court in *Monell*." *Pembaur*, 475 U.S. at 491 (O'Connor, J., concurring in part and concurring in the judgment).

*superior. Id.* at 479.

Here, Plaintiffs argue that Dr. Libutti acted as a final policymaker of Rutgers in ordering the October Imaging. "In order to ascertain if an official has final policy-making authority, and can thus bind the municipality by his conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy *in the particular area* of municipal business in question, and (2) whether the official's authority to make policy in that area is *final and unreviewable.*" *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (citations omitted). The quintessential example of such authority is that possessed by a "properly constituted legislative body." *Pembaur*, 475 U.S. at 480.

To establish Dr. Libutti as the relevant policymaker, Plaintiffs first point to Dr. Libutti's deposition testimony where he explained that he was the head of RCINJ and explained his general duties. (Pls. MSJ at 19 (citing ECF No. 196-4, Ex. 1, Libutti Dep. Tr. 9:20–10:9, 94:15–19).) Yet, being a high-ranking official does not render one as necessarily a final policymaker. "The Court cannot simply assume that a particular person, no matter how senior, counts as the final policymaker." *Cruz v. City of Paterson*, No. 20-15802, 2026 WL 850792, at *2 (D.N.J. Mar. 27, 2026) (discussing "mayor and police chief"); *see Kelly v. Borough of Carlisle*, 622 F.3d 248, 265 (3d Cir. 2010) (holding that police chief is not *per se* a final policymaker; instead, that determination can be made "only after examining the chief's responsibilities and decisionmaking authority with respect to the conduct at issue"). What matters is who the relevant decisionmaker was "in a particular area, or on a particular issue." *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997). Nothing in the cited portions of the deposition indicates that Dr. Libutti was the final policymaker for deciding whether to search an employee's office or employer-owned computer. The same is true of the organizational chart cited by Plaintiffs showing Dr. Libutti as the head of

18

RCINJ. (*See* Pls. MSJ at 20 n.6 (citing ECF No. 196-4, Ex. 9, Leadership of RCINJ).)

Next, Plaintiffs point to the fact that Rutgers policies provide that the "Executive Director of [RCINJ] is solely authorized to execute any and all Clinical Affiliation Agreements directly relating to [RCINJ]." (*See id.* at 20 (quoting ECF No. 196-4, Ex. 7, Clinical Affiliations Agreements Policy at 5).) This is irrelevant. "Clinical Affiliations" are "joint programs with other institutions . . . to provide a full range of clinical involvement for [Rutgers] students and faculty." (ECF No. 196-4, Ex. 7, Clinical Affiliations Agreements Policy at 1.) The fact that Dr. Libutti was empowered to enter into such agreements with other institutions says nothing about his authority to order the October Imaging, for the reasons just explained. Such an extrapolation is an attenuated bridge too far. In fact, this evidence indicates that Dr. Libutti's circumscribed authority of establishing things such as "Clinical Affiliations," which involve joint clinical/medical teaching opportunities for Rutgers students and faculty alike, appears quite distinct from serving as a final policymaker for imaging Rutgers-owned computers. To the extent this Clinical Affiliations policy simply shows that Dr. Libutti was a high-ranking official, such is insufficient to establish that he was the final policymaker in the "particular area" at issue. *McMillian*, 520 U.S. at 785.

Without explanation, Plaintiffs also point to Rutgers's "Acceptable Use Policy for Information Technology Resources" ("Acceptable Use Policy"). (*See* Pls. MSJ at 20 n.6 (citing ECF No. 196-4, Ex. 8, Acceptable Use Policy).) This policy makes no mention of Dr. Libutti, so it does not support Plaintiffs' reed-thin argument. (*See* ECF No. 196-4, Ex. 8, Acceptable Use Policy.) If anything, it bolsters Rutgers's position. The policy notes that "*the University . . . reserves the right to examine all computer files and content in order to protect individuals and the University.*" (*Id.* at 1 (emphasis added).) This identifies "the University" as the relevant policymaker, not Dr. Libutti. (*Id.*) The identification of Rutgers as the final policymaker, of course,

defeats a *Monell* theory premised on Dr. Libutti's actions or decisions. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion). The Acceptable Use Policy further explains that it is a "University Policy," that it is relevant to "[a]ll members of the Rutgers University Community," that "Approval Authority" for the policy is held by the "Executive Vice President for Finance and Administration and University Treasurer," that the "Responsible Executive" is the "Senior Vice President and Chief Information Officer," and that the "Responsible Office" is the "Office of Information Technology." (ECF No. 196-4, Ex. 8, Acceptable Use Policy at 1.) In short, the policy contains no reference Dr. Libutti, by name or title, as the policymaker or RCINJ in any capacity. To the contrary, there are multiple specific mentions of other university officers and offices that may possess the relevant policymaking authority.

Citing to Rutgers's letter to Dr. Libutti offering him the job of RCINJ Director, Plaintiffs also assert that Dr. Libutti's responsibilities included "directing RCINJ operations, resources, *and institutional response to incidents across the Cancer Institute*." (Pls. MSJ at 21 (emphasis added) (citing ECF No. 197, Ex. 10, Letter from Brian L. Strom to Dr. Libutti).) This argument fails because nothing in the letter cited by Plaintiffs discusses in any way "institutional response[s] to incidents." (*Id.*; *see generally* ECF No. 197, Ex. 10, Letter from Brian L. Strom to Dr. Libutti.) Plaintiffs hitching their wagon to such amorphous, vague language does not establish Dr. Libutti as a final policymaker on the discrete decision to image the Rutgers-owned computer used by Dr. Goydos in October of 2017 so as to attach *Monell* liability inculpating Rutgers.

Plaintiffs have not only failed to show that Dr. Libutti was a final policymaker with respect to the October Imaging, but facts in the record affirmatively show that he was not such a policymaker. As Plaintiffs themselves explain, "[w]hen Rutgers OGC learned of the [October Imaging], it immediately instructed RCINJ to stop internal investigative activity and directed that

any further steps proceed through proper OGC channels." (Pls. MSJ at 15.) OGC's exercise of control over the investigation demonstrates that Dr. Libutti lacked the "final and unreviewable" authority necessary to be a final policymaker in this area. *Hill*, 455 F.3d at 245 (emphasis removed). Plaintiffs try to avoid this natural conclusion by arguing that "[e]ven if OGC . . . possesses final authority over the enterprise forensic/investigative process, RCINJ's Director exercised final, unreviewed authority in a different sphere—operational incident response at RCINJ." (Pls. MSJ at 22.) However, as discussed in the preceding paragraphs, none of Plaintiffs' evidence supports the assertion that Dr. Libutti possessed such authority. Plaintiffs also contend that "at the moment of decision, Libutti's direction to RCINJ staff was not subject to prior approval or meaningful review within his domain." (*Id.* at 23.) This argument, too, fails. The ability to exercise discretion does not make one a final policymaker. *See Pembaur*, 475 U.S. at 481–83 (plurality opinion); *cf. Praprotnik*, 485 U.S. at 123 (plurality opinion) ("[A]n unjustified shooting by a police officer cannot, without more, be thought to result from official policy.").

In sum, Plaintiffs have failed to establish that Dr. Libutti was a final "policymaker[]" such that his "single decision" to order the October Imaging could render Rutgers liable for the search under *Monell*. *Pembaur*, 475 U.S. at 480. Because this is Plaintiffs' sole theory of liability, Plaintiffs' motion for summary judgment is **DENIED**. Instead, the Court **GRANTS** summary judgment in favor of Defendant on these grounds.[10]

---

[10] While Defendant does not discuss the *Monell* issue in its own motion for summary judgment, it thoroughly discusses it in opposition to Plaintiffs' motion. (*See* Def. MSJ; Def. Opp. at 20–23.) In the context of these cross-motions, the Court has no qualms with granting summary judgment on grounds raised only in an opposition. Because Defendant moved for summary judgment on all counts, Plaintiffs were on notice of the prospect that the Court might grant summary judgment in Defendant's favor, and due to Plaintiffs' decision to raise the *Monell* issue, Plaintiffs had adequate time and opportunity to brief the issue. *Cf. VanHook v. Cooper Health Sys.*, No. 21-2213, 2022 WL 990220, *4 (3d Cir. Mar. 31, 2022) ("District courts have 'the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence.' Notice is sufficient if the party 'had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" (citation

## 2.    Substantive Fourth Amendment Analysis

As an independently sufficient ground to grant summary judgment in favor of Defendant, the Court also analyzes the substance of Plaintiffs' Fourth Amendment claim. For the reasons explained below, the Court concludes that the October Imaging did not violate Dr. Goydos's Fourth Amendment rights.

The Fourth Amendment "'guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government,' without regard to whether the government actor is investigating crime or performing another function." *City of Ontario v. Quon*, 560 U.S. 746, 755–56 (2010) (quoting *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 613–14 (1989)). "The Fourth Amendment applies . . . when the Government acts in its capacity as an employer." *Id.* at 756 (citing *Treasury Emps. v. Von Raab*, 489 U.S. 656, 665 (1989)). However, the amendment does not apply in the exact same way to governmental employers. As the Supreme Court has explained, "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable for government employers." *Id.* (internal quotation marks omitted).

Neither the Supreme Court nor Third Circuit, however, has settled on the proper test to

---

omitted) (first quoting *Celotex*, 477 U.S. at 326; and then quoting *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 223 (3d Cir. 2004))). Additionally, the Third Circuit has explained that "[t]he notice requirement is satisfied when a case involves 'the presence of a fully developed record, the lack of prejudice, [and] a decision based on a purely legal issue.'" *Minn. Lawyers Mut. Ins. Co. v. Ahrens*, 432 F. App'x 143, 148 (3d Cir. 2011) (alteration in original) (quoting *Gibson*, 355 F.3d at 224). Here, the record on this point is fully developed, there is no indication that summary judgment in this posture would uniquely prejudice Plaintiffs, and "[t]he issue of whether an official has final policy making authority is a question of state law" to be resolved by the Court. *Harel v. Rutgers*, 5 F. Supp. 2d 246, 267 (D.N.J. 1998), *aff'd*, 191 F.3d 444 (3d Cir. 1999); *see Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Finally, even if Plaintiffs had sufficiently supported Defendant's liability under *Monell*, Defendant is independently entitled to summary judgment on Plaintiffs' Fourth Amendment claim because there is no genuine dispute of material fact concerning whether Dr. Goydos's Fourth Amendment rights were violated—the Court finds they were not.

assess warrantless searches by government employers. In *O'Connor v. Ortega*, a four-Justice plurality utilized one test, while Justice Scalia utilized another in his concurrence. 480 U.S. 709, 717–18, 725–26 (1987) (plurality opinion); *id.* at 731–32 (Scalia, J., concurring in the judgment). Courts frequently apply both tests in tandem. *See Quon*, 560 U.S. 764–65 (2010) (applying both tests); *Gwynn v. City of Philadelphia*, 719 F.3d 295, 303 & n.3 (3d Cir. 2013) (same). The Court will follow that approach and apply both tests here. As is frequently the case, they lead to the same conclusion.

Under the *O'Connor* Plurality's approach, the Court must first determine if the government employee had a reasonable expectation of privacy in what was searched. *O'Connor*, 480 U.S. at 717–19 (plurality opinion). If he did, then a search for "noninvestigatory, work-related purposes" or to investigate "work-related misconduct" is still constitutionally permissible if the search was reasonable in its "inception and the scope." *Id.* at 725–26. The Court will analyze the October Imaging using these two steps and note where Justice Scalia's approach diverges from that of the *O'Connor* Plurality.

> a.   *The Court Assumes That Dr. Goydos Had a Reasonable Expectation of Privacy*

Under the *O'Connor* Plurality's approach, the Court must first determine "on a case-by-case basis" whether the employee "has a reasonable expectation of privacy" in what was searched. *Id.* at 718. Here, despite the presence of Rutgers' Acceptable Use Policy, the Court will assume, *arguendo*, that Dr. Goydos had a reasonable expectation of privacy in his computer and office. *See Quon*, 560 U.S. 758–62 (assuming an expectation of privacy despite a similar policy). Under Justice Scalia's approach, "the offices of government employees, and *a fortiori* the drawers and files within those offices, are covered by Fourth Amendment protections as a general matter." *O'Connor*, 480 U.S. at 731 (Scalia, J., concurring in the judgment). Accordingly, the result is the

23

same: Dr. Goydos—at least for the sake of argument—had a reasonable expectation of privacy.

### b.  The October Imaging Was Reasonable in Its Inception and Scope

A warrantless search does not necessarily violate the Fourth Amendment even where an individual has a reasonable expectation of privacy. Among other exceptions, certain workplace searches may not violate the Fourth Amendment. *See Quon*, 560 U.S. at 761–62. On this point, the two tests align fairly closely. Under the *O'Connor* Plurality's approach, for a warrantless search by a government employer to be constitutional, "both the inception and the scope of the intrusion must be reasonable." *O'Connor*, 480 U.S. at 726 (plurality opinion). "Ordinarily, a search of an employee's office by a supervisor will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file." *Id.* Similarly, a search is justified under Justice Scalia's approach where "the employer had a legitimate reason for the search, and . . . the search was not excessively intrusive in light of that justification." *Quon*, 560 U.S. at 764; *see also O'Connor*, 480 U.S. at 732 (Scalia, J., concurring in the judgment).

Defendant argues that the October Imaging was "justified at its inception" because, by the time it was ordered, Mr. Vartan had learned the following through his investigation: first, employees found dust from the ceiling on their desks on Monday, September 18, 2017, reasonably suggesting that the camera was likely installed over the weekend (on Saturday the 16th or Sunday the 17th); second, Dr. Libutti was out of the country that weekend; third, there was already a review of Dr. Libutti's computer which revealed no incriminating information whatsoever involving the camera incident; fourth, Dr. Goydos was present at RCINJ for much of the day on both Saturday and Sunday; fifth, Dr. Goydos was present at RCINJ each of the ten recorded times that the door to the Director's Suite had been "forced open" between September 1 and September 17, 2017;

24

sixth, Rutgers had previously investigated Dr. Goydos after an employee accused him of improperly accessing the Director's Suite without permission; and seventh, Dr. Goydos had recently expressed animosity regarding Dr. Libutti. *O'Connor*, 480 U.S. at 726 (plurality opinion); (*see* Def. MSJ at 10–11; Def. Reply at 4–5.) Plaintiffs primarily contest this by arguing that there is not sufficient evidence in the record to indicate that Mr. Vartan knew these things *before* the October Imaging was ordered. (Pls. Opp. at 14–15, 15 n.14.)

The chronology of Mr. Vartan's investigation primarily comes from Mr. Vartan's deposition. (*See* ECF No. 194-5, Ex. 14, Vartan Dep. Tr.; Def. SUMF ¶ 29 (after discussing other aspects of Mr. Vartan's investigation, noting that "*[d]ue to the information Mr. Vartan learned regarding Plaintiff Goydos*, and in an effort to preserve evidence, he decided to have Plaintiff Goydos' Rutgers-issued work computer imaged" (emphasis added) (citing ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 15:10–21, 16:5–7)).)

On summary judgment, a nonmovant is entitled to all "*reasonable* inferences" but not "*unreasonable*" ones. *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 232 (3d Cir. 2017) (emphasis added). The order of events—investigating *then* imaging—is apparent from the context and plain language of the deposition. Any alternative chronology amounts to an unreasonable inference. *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1278 n.6 (11th Cir. 2002) ("Even in the summary judgment context, we are not required to accept any interpretation of testimony by the non-movant, no matter how strained. Instead, we need only accept every reasonable interpretation that the non-movant puts forward."); *see also Magnusson v. The Hartford*, 258 F. App'x 444, 446 n.2 (3d Cir. 2007) ("While we view the evidence in the light most favorable to the nonmoving party when ruling on a motion for summary judgment, we need not accept that party's . . . mischaracterizations of the evidence.").

When asked "what did you do" as part of the investigation, Mr. Vartan responded: "*First of all* I retained a firm called Secure Investigations . . . . We did go to the Cancer Institute." (ECF No. 194-5, Ex. 14, Vartan Dep. Tr. at 10:21–25 (emphasis added).) When asked "what else did you do *at that time*," Mr. Vartan responded, "Certainly interviewed employees who were willing to make themselves available, either when I was physically on-site with Secure Investigations or when I was at the Cancer Institute myself." (*Id.* at 11:9–15 (emphasis added).) Two pages later in the deposition, Mr. Vartan explained that "[b]ased upon my investigation," "I knew Dr. Goydos had framed [Dr. Libutti]." (*Id.* at 13:8–11.) He specifically recalled that "[d]uring interviews we met" with individuals who explained that when they returned to work on Monday they found "ceiling debris on [their] desk." (*Id.* at 13:22–14:1.) He further recalled that "[w]e certainly knew that Dr. Goydos . . . had some sort of history where he had been reprimanded before for[,] I think[,] breaking into the director's office." (*Id.* at 14:13–17.)

Most crucially, Mr. Vartan explained that "ultimately we made the decision to image a computer based upon my conversation with [Middlesex County Prosecutor] Mr. [Andrew] Carey. Meaning I believed that there would be a charge [against Dr. Libutti]. I was very certain that Dr. Libutti had been framed." (*Id.* at 16:16–20.) Earlier in the deposition, Mr. Vartan explained that it was by the time of his meeting with Mr. Carey that "I knew Dr. Goydos had framed [Dr. Libutti]" "[b]ased upon my investigation." (*Id.* at 13:8–11.) Finally, Mr. Vartan also explained that Dr. Goydos was "on my radar . . . screen right from the very beginning" because he wanted Dr. Libutti's job. (*Id.* at 33:16–21.)

Accordingly, the record is clear that Mr. Vartan's investigation commenced immediately upon his retainer and before his meeting with Mr. Carey, and that the October Imaging took place after that meeting. That initial investigation revealed, among other things, the ceiling debris and

26

the fact that Dr. Goydos had previously improperly accessed the Director's Suite. Moreover, "from the very beginning," Mr. Vartan knew that Dr. Goydos wanted Dr. Libutti's job. Regardless of when Mr. Vartan became aware of additional evidence, at that point, there were clearly "reasonable grounds for suspecting that the search w[ould] turn up evidence that the employee [wa]s guilty of work-related misconduct." *O'Connor*, 480 U.S. at 726 (plurality opinion).[11]

Plaintiffs' other attempts to argue that the search was constitutionally infirm also miss the mark. Plaintiffs contend that the October Imaging "was ordered by RCINJ leadership (Dr. Libutti), not by institutional counsel or IT pursuant to an established administrative protocol." (Pls. Opp. at 14.) It is unclear how this would affect the constitutionality of the search as discussed above. If anything, it seems to further show the shortcomings of Plaintiffs' *Monell* theory, not any substantive flaw with the search. Similarly, Plaintiffs argue that Mr. Vartan "is not a government decision-maker for Fourth Amendment purposes and cannot supply a work-related justification on Rutgers' behalf." (*Id.* at 15.) It is again unclear, however, why the fact that Mr. Vartan—instead of Dr. Libutti personally—conducted the investigation should matter. *Cf. United States v. Whitfield*, 634 F.3d 741, 746 (3d Cir. 2010) ("'[B]ecause the search was a joint endeavor, the court may properly consider' what other officers knew . . . ." (quoting *United States v. Ledford*, 218 F.3d 684, 689 (7th Cir. 2000))).

Plaintiffs next argue that the search was "investigatory or criminal in purpose," rendering the *O'Connor* Plurality's framework inapposite. (Pls. Opp. at 16.) True, the *O'Connor* Plurality's approach was limited to "noninvestigatory work-related intrusion[s] [and] investigatory search[es] for evidence of suspected work-related employee misfeasance." *O'Connor*, 480 U.S. at 723

---

[11] It is clear elsewhere in the record that the October Imaging followed other aspects of the investigation. For example, a Rutgers employee through whom the order to image Dr. Goydos's computer was conveyed explained that, in seeking the image, Secure Investigations was "following . . . leads." (ECF No. 194-5, Ex. 18, Tanzer Interview Tr. 8:5–6.)

27

(plurality opinion). The Court finds that the *O'Connor* Plurality's framework applies here because the October Imaging appears more akin to an "investigatory search for evidence of suspected work-related employee misfeasance," not a criminal investigation. *Id.* Specifically, neither Mr. Vartan nor Dr. Libutti are vested with any authority to investigate crimes, make charging decisions, direct or oversee criminal investigators, commence grand jury proceedings, or the like. *See United States v. Slanina*, 283 F.3d 670, 678–79 (5th Cir. 2002) (noting the "obvious distinction" between workplace searches by public employers who are law enforcement officials and those who are not), *vacated on other grounds*, 537 U.S. 802 (2002)

In any event, even if the October Imaging can be stretched somehow to be construed as a partial criminal investigation, an investigation can be both work-related and involve the investigation of a crime. As one of the very cases cited by Plaintiffs explains, "*O'Connor*'s goal of ensuring an efficient workplace should not be frustrated simply because the same misconduct that violates a government employer's policy also happens to be illegal." *Id.* at 678; (Pls. Opp. at 16.) Instead, "cases upholding searches by government employers into criminal, work-related misconduct are fully consistent with the reasoning in *O'Connor*." *Slanina*, 283 F.3d at 678; *see also* Wayne R. LaFave, 5 Search & Seizure § 10.3(d) n.214 (6th ed. Nov. 2025 update) (compiling cases). Here, entering a supervisor's office without permission, attempting to frame the supervisor, and spying on co-workers, patients, or both certainly amounted to not only violations of criminal law but also "work-related employee misfeasance." *O'Connor*, 480 U.S. at 723 (plurality opinion); *see Slanina*, 283 F.3d at 679 (holding that search of office computer for child pornography was sufficiently "work-related").

The other cases cited by Plaintiffs do not alter this analysis. (*See* Pls. Opp. at 15–16.) The Ninth Circuit's decision in *United States v. Taketa* involved a search by Drug Enforcement

Administration agents of a state law enforcement officer's office in their shared workplace. 923 F.2d 665 (9th Cir. 1991). In other words, the search was conducted by a public employer who was also a law enforcement agent. There is "an obvious distinction" between the search conducted here by non-law-enforcement individuals and the search at issue in *Taketa*. *Slanina*, 283 F.3d at 678. Moreover, in *Taketa*, "the government employer testified that the investigation became wholly criminal." *Slanina*, 283 F.3d at 678 n.7. That is not the case here: the evidence yielded as a result of the October Imaging was not used, let alone viewed, by any law enforcement personnel in a criminal investigation related to the subject incident. The Supreme Court's decision in *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), is even less apt. That case involved a hospital policy that subjected certain pregnant patients to urine tests for cocaine. *Ferguson*, 532 U.S. at 71. The tests were conducted without the patients' "informed consent" and the "objective of the searches was to generate evidence *for law enforcement purposes*." *Id.* at 77, 83 (emphasis in original). The Court held that these searches, *unlike those at issue in O'Connor*, did not "fit within the closely guarded category of 'special needs.'" *Id.* at 84; *see O'Connor*, 480 U.S. at 725 (plurality opinion).

Finally, Plaintiffs contend that the scope of the search—a full image of the computer—was so broad that it rendered the search unconstitutional. (Pls. Opp. at 16–18); *see O'Connor*, 480 U.S. at 726 (plurality opinion) (explaining that the "scope" of the search "must be reasonable"). This argument, too, fails. The Supreme Court "has repeatedly refused to declare that only the least intrusive search practicable can be reasonable under the Fourth Amendment." *Quon*, 560 U.S. at 763 (cleaned up) (compiling cases). As another court has explained, in the context of searches of computers, "[i]t is unrealistic to expect a warrant to prospectively restrict the scope of a search by directory, filename or extension or to attempt to structure search methods—that process must remain dynamic." *United States v. Burgess*, 576 F.3d 1078, 1093 (10th Cir. 2009). This is because,

"[w]hile file or directory names may sometimes alert one to the contents (*e.g.*, . . . 'meth stuff,' . . . ), illegal activity may not be advertised even in the privacy of one's personal computer—it could well be coded or otherwise disguised." *Id.* Even though there was no warrant here, the rationale remains the same. As the Supreme Court explained in *Quon*, the Fourth Amendment does not require that searches be as limited as possible. Such a requirement "could raise insuperable barriers to the exercise of virtually all search-and-seizure powers because judges engaged in *post hoc* evaluations of government conduct can almost always imagine some alternative means by which the objectives of the government might have been accomplished." *Quon*, 560 U.S. at 763 (cleaned up). Accordingly, because it was not clear at the time of the October Imaging where or how any incriminating material would have been stored, a full imaging was necessary, and "the measures adopted [were] reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct." *O'Connor*, 480 U.S. at 726 (plurality opinion) (cleaned up) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985)).

"[B]oth the inception and the scope of the" October Imaging were "reasonable," rendering the search constitutional under the *O'Connor* Plurality's approach. *O'Connor*, 480 U.S. at 726 (plurality opinion). "For these same reasons—that the employer had a legitimate reason for the search, and that the search was not excessively intrusive in light of that justification—the Court also concludes that the search would be 'regarded as reasonable and normal in the private-employer context' and would satisfy the approach of Justice Scalia's concurrence." *Quon*, 560 U.S. at 764–65 (quoting *O'Connor*, 480 U.S. at 732 (Scalia, J., concurring in the judgment)). For this reason, in addition to the *Monell* rationale discussed above, *see supra* Section III.A.1, the Court **GRANTS** Defendant's motion for summary judgment on the Fourth Amendment claim. [12]

---

[12] Because the Court rejects Plaintiffs' arguments regarding the October Imaging, the Court also rejects Plaintiffs' brief and procedurally questionable request to "revisit" its years-old dismissal of claims related

## B.    THE FIFTH AMENDMENT CLAIM

Defendants move for summary judgment on Plaintiffs' Fifth Amendment claim. (*See* Def. MSJ at 14–19.) The crux of Plaintiffs' argument is that, as part of the investigation into the camera incident, Rutgers forced Dr. Goydos to choose between his Fifth Amendment rights and his job. (*See* Pls. Opp. at 21.) Plaintiffs are correct that a public employee cannot be forced to make such a choice. *See Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280, 284 (1968). Plaintiffs, however, are incorrect in their assertion that Dr. Goydos was forced to make this choice.

"[T]he touchstone of the Fifth Amendment is compulsion . . . ." *Newman v. Beard*, 617 F.3d 775, 780 (3d Cir. 2010) (alterations in original) (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977)). The Fifth Amendment right against self-incrimination "does not apply in the absence of compulsion." *Capers v. Governor of N.J.*, 525 F. App'x 69, 72 (3d Cir. 2013) (citing *Lefkowitz*, 431 U.S. at 806).

Plaintiffs claim that Dr. Goydos was compelled when counsel for Rutgers, on March 23, "communicated that Dr. Goydos *could* be directed by his supervisor to appear and that failure to cooperate *could* result in disciplinary proceedings and disciplinary action." (Pls. Opp. at 24 (emphasis added); *see id.* at 26.) However, the communications cited by Plaintiffs do not demonstrate any compulsion on behalf of Rutgers. Outside counsel for Rutgers simply explained that if Dr. Goydos declined to answer questions, he "may next be directed by his supervisor to appear for the purpose of answering questions" and that, if he did not cooperate then, "he may be subject to disciplinary proceedings and disciplinary action." (ECF No. 202-3, Ex. R-3, February 15 to March 23, 2018 Email Exchange at D-218 (email memorializing call); *see* ECF No. 202-3,

---

to the November Imaging. (*See* Pls. Opp. at 19–20 ("On the developed summary judgment record, the same deficiencies that doom Rutgers' October justification—lack of a defined work-related purpose and excessive scope—apply with equal force to November."); *see also* ECF Nos. 76, 102 (holding that the November Imaging was constitutional).)

Ex. R-8, Maderer Dep. Tr. at 55:15–16 (confirming accuracy of memorialization).) This is an explanation of how things could potentially progress in the future, not "compulsion" as is required to implicate the Fifth Amendment. *Newman*, 617 F.3d at 780 (quoting *Lefkowitz*, 431 U.S. at 806).

This also matters in terms of the logistics of any potential interview and immunity. Because Rutgers's communications with Dr. Goydos never reached the point of actually compelling him to sit for an interview, Rutgers did not have any occasion to offer to immunize his statements, which Plaintiffs concede would have nullified any constitutional concerns with any compelled interview. (*See* Pls. Opp. at 25–26); *see also Fraternal Order of Police v. City of Philadelphia*, 859 F.2d 276, 282 (3d Cir. 1988) (declining to determine "whether a public employer must inform employees that use immunity attaches to questions relating to official duties, when the employee is required, on pain of dismissal, to answer the questions").

Perhaps recognizing the weakness of this argument, Plaintiffs point to the fact that, seven days after the communications detailed above, on March 30, Dr. Goydos was placed on paid administrative leave. (Pls. Opp. at 26.) Plaintiffs contend that "[t]he tight temporal proximity between the deposition-style demand backed by explicit discipline threats and the ensuing leave/ban/surrender order creates, at minimum, a triable issue that Rutgers imposed job-related penalties when Dr. Goydos declined to provide compelled testimony." (*Id.* at 27.) Yet, curiously, Plaintiffs fail to note that *the very day* Dr. Goydos was placed on paid administrative leave, he was arrested for his unlawful possession of an assault rifle, a charge for which he was subsequently indicted by a grand jury and to which he pleaded guilty and for which he was sentenced to imprisonment. (*See* Def. SUMF ¶¶ 56–57, 78, 85; Resp. to Def. SUMF ¶¶ 56–57, 78, 85.) Indeed, Dr. Goydos was provided with the papers placing him on administrative leave while he was handcuffed to a bench at the New Brunswick Police Department. (ECF No. 194-5, Ex. 2, Goydos

32

Dep. Tr. at 178:5–18.) "[E]ven in cases where the proximity of events and/or other evidence of retaliatory animus is sufficient to create an inference of causation, a causal link between an employee's protected activity and an adverse employment action can be broken by an intervening event." *Hernandez v. Temple Univ. Hosp.*, No. 17-4381, 2019 WL 130508, at *9 (E.D. Pa. Jan. 8, 2019) (cleaned up) (compiling cases).

In light of the intervening events—the signed search warrants on March 29, the execution of the warrants on March 30, and Dr. Goydos's arrest on March 30—there is simply no genuine dispute of material fact that Dr. Goydos's placement on leave was caused by anything other than the search and Dr. Goydos's subsequent arrest. This conclusion is bolstered by the fact that Rutgers made it clear to Dr. Goydos that any disciplinary action against him based on his refusal to sit for an interview would only occur after a further request from Rutgers and his subsequent denial. Accordingly, Defendant's motion for summary judgment on the Fifth Amendment claim is **GRANTED**.

### C.    THE CONVERSION CLAIM

Defendant moves for summary judgment on Plaintiffs' conversion claim. (Def. MSJ at 19–23.) Plaintiffs' claims are based on Rutgers's continued possession of property allegedly belonging to Dr. Goydos after he was placed on leave and resigned. As Judge Castner observed in allowing Plaintiffs' conversion claim to proceed to discovery, Plaintiffs' allegations "border the line between factual and conclusory." (ECF No. 102 at 23.) Discovery has not sufficiently substantiated these claims.

Under New Jersey law, "[t]he elements of conversion are: '(1) the property and right to immediate possession thereof belong to the plaintiff and (2) the wrongful act of interference with that right by the defendant.'" *Gap Props., LLC v. Cairo*, No. 19-20117, 2012 WL 5757410, at *4 (D.N.J. Dec. 3, 2021) (quoting *Latef v. Cicenia*, No. A-5747-13T2, 2015 WL 10458543, at *5

(N.J. App. Div. Mar. 14, 2016)). "Additionally, where the defendant lawfully acquired plaintiff's property, the plaintiff must show that he demanded the return of the property and that the defendant refused compliance." *Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 661 (N.J. 2020). "The demand is the linchpin that transforms an initial lawful possession into a setting of tortious conduct." *Id.* Moreover, the refusal of a demand alone does not make the possession tortious; "the refusal must be wrongful." *Id.* (quoting *Mueller v. Tech. Devices Corp.*, 84 A.2d 620, 623 (N.J. 1951)). A lawful possessor may "prescribe conditions which qualify his duty to return . . . property," such as that the alleged owner provide "proof of ownership." *Sgro v. Getty Petroleum Corp.*, 854 F. Supp. 1164, 1181 (D.N.J. 1994) (citing *Mueller*, 84 A.2d at 625; *Hildegarde, Inc. v. Wright*, 70 N.W.2d 257, 259–60 (Minn. 1955); and *Bradley v. Roe*, 27 N.E.2d 35, 38–39 (N.Y. 1940)).[13]

Here, the uncontested facts demonstrate that that is all Rutgers required—that Dr. Goydos provide "proof of ownership." *Id.*; (*See* Def. SUMF ¶¶ 60, 66, 68, 69, 72, 75, 76; Resp. to Def. SUMF ¶¶ 60, 66, 68, 69, 72, 75, 76.) Dr. Goydos admits he never did. (Def. SUMF ¶ 77; Resp. to Def. SUMF ¶ 77.) This, however, does not end the analysis. The demand requirement, and derivative license to condition the return of property, only applies where the initial acquisition was lawful. *See Meisels*, 222 A.3d at 661; *Imp. Serv. Corp. v. Aliotta*, No. 22-4640, 2024 WL 2765620, at *13 (D.N.J. May 30, 2024). Rutgers's initial acquisition of the property at issue was lawful. Dr. Goydos chose to store allegedly personal property in his RCINJ office, and, after he was placed on leave and eventually resigned, Rutgers held it for him until he could establish ownership. In

---

[13] *See also, e.g., Billsie v. Brooksbank*, 525 F. Supp. 2d 1290, 1296 (D.N.M. 2007) ("Under certain circumstances, a defendant seeking to ascertain the true owner of the property in question may retain the property for a reasonable time period after the demand." (quoting *Boroughs v. Garrett*, 352 P.2d 644, 647 (N.M. 1960))); *Zimmerman v. FirsTier Bank, N.A.*, 585 N.W.2d 445, 448 (Neb. 1998) ("A bona fide reasonable detention of property by one who has assumed some duty respecting it, for the purpose of ascertaining its true ownership, or of determining the right of a demandant to receive it, will not sustain an action for conversion.").

doing so, Rutgers was exercising a right equivalent to that when a landlord chooses to hold an evicted tenant's property in storage. *See Banks v. Korman Assocs.*, 527 A.2d 933, 934 (N.J. Super. Ct. App. Div. 1987); *see also Niceforo v. UBS Glob. Asset Mgmt. Ams., Inc.*, 20 F. Supp. 3d 428, 433 (S.D.N.Y. 2014) ("[The employer] therefore acquired the property lawfully at the outset because [the employee] herself brought it to [the employer]'s offices and left it there."). Indeed, Rutgers went even further than necessary by allowing Dr. Goydos to come to campus, inspect the items, and retrieve certain belongings. (Def. SUMF ¶¶ 68–70; Resp. to Def. SUMF ¶¶ 68–70.)

In sum, because Rutgers lawfully obtained possession of property contained in its office which Dr. Goydos used, it was entitled to require "proof of ownership" before providing any property to Dr. Goydos which he claimed belonged to him. *Sgro*, 854 F. Supp. at 1181. Because Dr. Goydos failed to provide such proof, Rutgers's refusal was not "wrongful," and Plaintiffs cannot succeed on their conversion claim. *Meisels*, 222 A.3d at 661 (quoting *Mueller*, 84 A.2d at 623). Accordingly, Defendant's motion for summary judgment on the conversion claim is **GRANTED**.[14]

### D.    THE *PER QUOD* CLAIM

Finally, Defendant moves for summary judgment on the *per quod* claim raised by Dr. Martins, Dr. Goydos's wife. "A *per quod* claim is a derivative cause of action whose viability depends on the existence of tortious conduct against the injured spouse." *Lockhart v. Willingboro*

---

[14] Plaintiffs also request that, pursuant to Federal Rule of Civil Procedure 56(d), summary judgment be "deni[ed] or deferr[ed]" because Rutgers has not provided Dr. Goydos's lab inventory or lab notebook, which would establish what items Dr. Goydos owned and the value of the items. (Pls. Opp. at 30–31.) The Court declines Plaintiffs' request because the purported evidence "pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law." *In re Avandia Mktg., Sales & Prods. Liab. Litig.*, 945 F.3d 749, 761 (3d Cir. 2019) (quoting *Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015)). Even if the inventory and notebook contain everything Plaintiffs promise and they would allow them to conclusively demonstrate to the Court that Dr. Goydos owned the items at issue, that would still not alter the immutable and dispositive fact that Dr. Goydos failed to provide *Rutgers* with anything evincing his ownership of the property at issue when Rutgers requested such documentation.

*High Sch.*, No. 14-3701, 2017 WL 4364180, at *8 (D.N.J. Sept. 29, 2017) (citing *Tichenor v. Santillo*, 527 A.2d 78 (N.J. Super. Ct. App. Div. 1987)). Because the Court has granted summary judgment against Plaintiffs on all other claims, there is nothing for Dr. Martins's claim to derive from, and it "must also fail." *Id.*; *see also, e.g.*, *K.G. v. Owl City*, No. 17-8118, 2023 WL 3735891, at *11 (D.N.J. May 31, 2023), *aff'd*, No. 24-1175, 2025 WL 1577565 (3d Cir. June 4, 2025); *Dello Russo v. Nagel*, 817 A.2d 426, 435 (N.J. Super. Ct. App. Div. 2003). Accordingly, Defendant's motion for summary judgment on the *per quod* claim is **GRANTED**.[15]

---

[15] The Court is cognizant of the fact that, in its Answer, Rutgers requested that the Court award it "reasonable attorneys' fees and costs incurred in defending this meritless and vexatious action." (ECF No. 139 at 39.) The Court is also aware that fees may be warranted, at least in connection to Plaintiffs' Section 1983 claims. *See* 42 U.S.C. § 1988(b) ("[In a Section 1983 action] the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ."). However, given the presence of Rutgers's still pending counterclaims, (*see* ECF No. 139 at 40–60), the Court will defer on the issue of fees until Rutgers informs the Court as the whether it still seeks to proceed as to its counterclaims which now, in light of this Opinion, are the only claims which remain.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiffs' Motion for Summary Judgment is **DENIED**. An appropriate Order accompanies this Opinion.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: June 26, 2026

37